Argued and submitted January 10, judgment reversed and remanded;
supplemental judgment for attorney fees vacated October 1, 2008

ZRZ REALTY COMPANY,
an Oregon corporation,
for itself and as trustee of
the Zidell Remediation Funding Trust,
an Oregon trust;
Zidell Marine Corporation,
a Washington corporation;
Tube Forgings of America, Inc.,
an Oregon corporation;
and Pon Exploration, Inc.,
a Delaware corporation,
fka Zidell Explorations, Inc.,
an Oregon corporation,
*Plaintiffs-Respondents,
Cross-Appellants,*

*v.*

BENEFICIAL FIRE AND CASUALTY
INSURANCE COMPANY,
succeeded in interest by
J.C. Penney Life Insurance Company, et. al.,
*Defendants,*

*and*

CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON,
and Certain London Market Insurance Companies,
aka "Lloyds,"
including the following defendant companies:
Assicurazioni Generali S.P.A.,
Insurance Company of North America (UK), Ltd.,
Commercial Union Assurance Company, PLC,
Edinburgh Assurance Company, Ltd.,
Ocean Marine Insurance Company, Ltd.,
World Auxiliary Insurance Corporation, Ltd.,
Cornhill Insurance Company, Ltd.,
Dominion Insurance Company, Ltd.,
Eagle Star Insurance Company, Ltd.,
The Threadneedle Insurance Company, Ltd.,
Excess Insurance Company, Ltd.,
London & Edinburgh General Insurance Company, Ltd.,

New Zealand Insurance Company, Ltd.,
Road Transport & General Insurance Company, Ltd.,
South British Insurance Company, Ltd.,
Ulster Marine Insurance Company, Ltd.,
The United Scottish Insurance Company, Ltd.,
Yorkshire Insurance Company, Ltd.,
Hansa Re & Marine Insurance Company (UK), Ltd.,
La Reunion Francaise (UK), Ltd.,
Economic Insurance Company, Ltd.,
Norwich Union Fire Insurance Society, Ltd.,
Firemen's Insurance Company of Newark, New Jersey,
Swiss Union General Insurance Company, Ltd.,
Leadenhall Insurance Company, Ltd.,
Bishopgate Insurance Company, Ltd.,
Home Insurance Company,
Nippon Fire & Marine Insurance Company (UK), Ltd.,
Switzerland General Insurance Company, Ltd.,
River Thames Insurance Company, Ltd.,
Royal Insurance Company, Ltd.,
British Fire Insurance Company, Ltd.,
British & Foreign Insurance Company, Ltd.,
National Provincial Insurance Company, Ltd.,
The Scottish Lion Insurance Company, Ltd.,
Skandia Marine Insurance Company (UK), Ltd.,
Drake Insurance Company, Ltd.,
Sphere Insurance Company, Ltd.,
Sphere Drake Insurance Company, PLC,
Alliance Assurance Company, Ltd.,
British Law Insurance Company, Ltd., and
Continental Assurance Company of London, Ltd.,
Liverpool Marine & General Insurance Company, Ltd.,
Phoenix Assurance Company, Ltd.,
Fine Art & General Insurance Company, Ltd.,
Anglo-French Insurance Company, Ltd.,
Baloise Marine Insurance Company, Ltd.,
Baltica Insurance Company (UK), Ltd.,
Fuji Fire & Marine Insurance Company (UK), Ltd.,
R.W. Gibbon Group,
La Preservatrice Group,
Switzerland General Insurance Company (London), Ltd.,
Yasuda Fire & Marine Insurance Company, Ltd.,

Iron Trades Mutual Insurance Company, Ltd.,
Minster Insurance Company, Ltd.,
Reliance Insurance Company,
Sirius (UK) Insurance, PLC,
Indemnity Marine Assurance Company, Ltd.,
London & Hull Maritime Insurance Company, Ltd.,
and associated companies,
C.A. Parr Agencies, Ltd.,
Sun Insurance Office,
Marine Insurance Company, Limited,
and Sumitomo Marine & Fire Insurance Company, Limited,
*Defendants-Appellants,*
*Cross-Respondents.*

Multnomah County Circuit Court
970806226; A121145

194 P3d 167

Thomas W. Sondag argued the cause for appellants - cross-respondents. With him on the briefs were Kirklin Folawn LLP, John Folawn, and Lane Powell PC.

Bruce L. Campbell argued the cause for respondents - cross-appellants. On the answering/cross-opening brief were Miller Nash LLP, William H. Walters, Dean D. DeChaine, Anderson Kill & Olick, P.C., Robert M. Horkovich and Edward J. Stein. With him on the reply brief were Miller Nash LLP, Dean D. Dechaine, and Michelle E. Barton.

Gregory L. Baird and Gordon & Polscer, LLP, filed the briefs *amicus curiae* for Complex Insurance Claims Litigation Association.

Before Wollheim, Presiding Judge, and Sercombe, Judge, and Riggs, Senior Judge.

WOLLHEIM, P. J.

## WOLLHEIM, P. J.

This insurance coverage dispute involves environmental contamination that resulted from plaintiffs' dismantling of navy and merchant marine vessels at a site along the Willamette River. Plaintiff ZRZ Realty owns that site, known as the "Moody Avenue site." The other plaintiffs conducted operations at the site or are successors-in-interest to prior site operators. We refer to plaintiffs collectively as "Zidell."

Zidell initially brought this action against a number of its insurers, asserting various claims for damages and seeking a declaration of coverage with regard to future environmental cleanup costs. By the time of trial, most of the insurers had settled, but defendants on appeal, Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies (referred to collectively as "London"), remained in the case.[1] Zidell's claims for breach of contract and declaratory judgment against London were tried to the court, and the court made extensive findings of fact and conclusions of law. In short, the court ruled that London was obligated to pay Zidell's costs of defense and determined how future coverage would be allocated under various policies. The trial court then entered judgment awarding attorney fees to Zidell in excess of $1.3 million; declaring that certain London defendants were obligated to pay Zidell's future defense costs in responding to a claim by the Department of Environmental Quality (DEQ); and stating that the parties' future rights and obligations were circumscribed by the court's findings and conclusions. The court later entered a supplemental judgment that awarded Zidell additional attorney fees.

London appeals the judgment and supplemental judgment, and Zidell cross-appeals. On appeal, we conclude that, on some of the policies, the trial court erred in allocating the burden of proof with respect to whether the environmental contamination was "expected and intended" by Zidell and that the case must therefore be remanded for a new trial on the breach of contract and declaratory judgment claims.

---

[1] In addition to London, a few other insurers remained in the case through trial. Those insurers, however, settled before judgment was entered.

Accordingly, we reverse the judgment in favor of Zidell and vacate the supplemental judgment for attorney fees. At the request of the parties and because certain issues are likely to arise on remand, we also address a number of the trial court's other rulings.

## I. BACKGROUND

In 1919, Zidell established a scrap metal business at Moody Avenue on the bank of the Willamette River. After World War II, Zidell began acquiring decommissioned navy and merchant marine ships, towing them up the Columbia and Willamette Rivers to the Moody Avenue site, and dismantling them. Between 1947 and 1978, Zidell dismantled upward of 200 ships and, at the height of its business, processed 2,000 to 3,000 tons of steel each day.

The scrapping operation was, by all accounts, messy business. Various metals, petroleum products, tributyltin, polychlorinated biphenyl (PCB), asbestos, and other contaminants were present on the ships. For instance, on ships built prior to 1960, nearly every surface was covered in lead-based, anti-corrosive paint. The typical "Liberty" ship that was dismantled at the Moody Avenue site contained approximately 80 tons of dried paint; the typical "Victory" ship contained approximately 100 tons of dried paint. PCB was present in paint, hydraulic oil, fluorescent light fixtures, electric cables, transformers, wires, and gaskets on ships, and the scrapping of a single "C-4" vessel could generate 75,000 pounds of PCB-contaminated material. As vessels were cut up piece by piece and moved in and out of the water, a number of those hazardous substances entered the Willamette River and the soil and groundwater at and around the Moody Avenue site. Additional contamination resulted from fires, spills, and barge-building activities that occurred at the site over the years.

Eventually, DEQ became concerned about environmental contamination in sediments at the Moody Avenue site and, in May 1994, issued a "potentially responsible party" notice to Zidell. DEQ demanded that Zidell investigate and clean up certain damaged property, including the groundwater, Willamette River, sediments, and subsurface soil contamination at and around the Moody Avenue site. Zidell undertook that investigation as well as various efforts

at remediation. In July 1994, Zidell sent a letter to its insurers regarding the potentially responsible party notice that Zidell had received from DEQ. In response, the insurers denied coverage. Zidell subsequently brought this action seeking coverage for existing and future environmental cleanup costs at the Moody Avenue site.

During the majority of the scrapping operation—that is, from 1956 through 1983—Zidell was insured under various London policies that provided different types of coverage. For example, Zidell purchased primary and excess comprehensive general liability insurance policies from London. Between 1970 and 1977, London also sold Zidell "bumbershoot" policies, which were designed to cover excess maritime liability and certain nonmarine exposures related to marine operations. In addition, London specifically provided coverage to Zidell for ship dismantling under "open cover" marine policies. Under the "open cover" policies, Zidell declared specific vessels for coverage instead of obtaining a separate policy for each vessel. Those policies provided, among other things, primary protection and indemnity coverage for all declared vessels awaiting or undergoing scrapping or repair and resale—that is, as long as Zidell's liability arose "by reason of interest in the vessel."

In its operative complaint, Zidell alleged that London had breached its obligations under various policies by failing to pay for costs associated with the investigation and remediation of contamination at the Moody Avenue site. Specifically, Zidell alleged that London

> "refused or otherwise failed to provide Zidell with a defense of the DEQ action, to pay defense, investigation and loss mitigation costs, and/or pay Zidell for all liabilities and damages Zidell has been legally obligated to incur because of unexpected or unintended third-party property damage occurring during [the] respective Insurance Policy periods."

Zidell also sought a declaration concerning London's future obligations under the various policies with respect to coverage for defense, investigation, and loss mitigation costs and other liabilities for third-party property damage at the Moody Avenue site that Zidell might later incur.[2]

---

[2] Zidell alleged a number of other claims that were dismissed before trial.

In October 1999, the trial court ruled on a number of summary judgment motions, including Zidell's motion for partial summary judgment regarding London's duty to defend against the DEQ action as alleged in Zidell's first claim for relief (breach of contract) and second claim for relief (declaratory judgment). The trial court ruled that the May 10, 1994, potentially responsible party letter is the equivalent of a suit, which raises the duty to defend." The court further ordered London to pay those defense costs previously submitted by Zidell.

The parties subsequently waived their rights to a jury trial and the first and second claims for relief were tried to the court in late 1999. The trial was then followed by nearly three years of wrangling between the parties and the trial court concerning proposed findings of fact and conclusions of law. In July 2002, the court issued its "First Findings of Fact and Conclusions of Law"—some 96 pages of detailed findings and conclusions concerning exceptionally complex factual and legal issues. At this juncture, it suffices to say that the trial court found, among other things, that London was liable for certain existing cleanup costs as "defense costs"[3] and that Zidell was entitled to certain future indemnity costs, the amount of which was yet to be determined. In December 2002, the trial court issued its "Second Findings of Fact and Conclusions of Law," an equally extensive recital of the court's findings and conclusions concerning the allocation of liability among various London insurers under various policies.

In April 2003, the trial court entered a judgment that awarded attorney fees to Zidell in excess of $1.3 million; declared that certain London defendants were obligated to pay Zidell's future defense costs in responding to claims by DEQ; and stated that the parties' future rights and obligations concerning coverage were circumscribed by the court's previous findings and conclusions. The court later entered a

---

[3] During the course of trial, the court ruled that Zidell's "defense costs," which London owed pursuant to its duty to defend, exceeded $1 million with respect to the DEQ action. After being ordered to pay that sum, London did so, prior to the entry of judgment.

supplemental judgment that awarded Zidell an additional $268,988.15 in attorney fees.[4]

London appeals the judgment and supplemental judgment. Its 10 assignments of error concern three general subject areas: (1) issues concerning proof of coverage for "expected or intended" losses; (2) the scope of coverage under marine insurance policies for property damage resulting from ship scrapping operations; and (3) Zidell's entitlement to attorney fees. Zidell cross-appeals, arguing that the trial court erred in allocating responsibility among multiple insurers on a single environmental risk; in concluding that certain policies do not provide coverage for Zidell's defense costs and expenses; in ruling that Zidell could not be indemnified for soil cleanup to prevent future groundwater contamination; and in limiting the award of attorney fees to Zidell.

## II. ANALYSIS

A. *London's Appeal*

1. *Expected or intended loss*

a. Burden of proof

In its first assignment of error, London contends that the trial court erred by assigning to London the burden of proving that Zidell expected or intended the damage for which it sought coverage.[5] According to London, that error not only requires reversal of the judgment, but it also requires that judgment be entered *in London's favor*.

Throughout its operative complaint, Zidell alleged that the damages that it incurred to clean up the Moody Avenue site resulted from "unexpected and unintended"

---

[4] All of the relevant trial and pretrial rulings, including the first and second "Findings of Fact and Conclusions of Law" were made by the Honorable William J. Keys. The judgment, however, was signed by the Honorable Ellen F. Rosenblum. The issues raised by Zidell's supplemental statement of attorney fees were decided by Judge Rosenblum.

[5] We note, as we did in *Employers Insurance of Wausau v. Tektronix, Inc.*, 211 Or App 485, 509 n 10, 156 P3d 105, *rev den*, 343 Or 363 (2007), that the term "burden of proof" is an inexact term. Nonetheless, because the parties and the courts that have addressed these issues have frequently referred to the "burden of proof," we use that term in the text of this opinion for convenience.

property damage. In its claim for breach of contract, Zidell alleged:

> "In breach of their respective Insurance Policies, Defendants have refused or otherwise failed to provide Zidell with a defense of the DEQ Action, to pay defense, investigation and loss mitigation costs, and/or to pay Zidell *for all liabilities and damages Zidell has been legally obligated to incur because of unexpected or unintended third-party property damage* occurring during Defendants' respective Insurance Policy periods."

(Emphasis added.) In its claim for declaratory relief, Zidell alleged:

> "65. *Under the terms of their Insurance Policies, Defendants have a duty to defend Zidell against all claims made against Zidell alleging the possibility of unexpected and unintended third-party property damage* occurring during their respective Insurance Policy periods and/or to pay investigation and loss mitigation costs incurred in responding to such claims, to alleged legal liabilities and/or to the third-party property damage that is alleged to have happened, or could have happened, during Defendants' respective Policy periods.
>
> "66. The Insurance Policies provide Zidell with insurance coverage for liabilities and damages that Zidell is *legally obligated to incur because of unexpected and unintended third-party property damage* existing during Defendants' respective Policy periods, including, but not limited to, liabilities and damages arising out of the DEQ action."

(Emphasis added.)

As noted above, during the period in which environmental contamination occurred, London sold various types of insurance to Zidell, including general liability policies, "open cover" policies, and bumbershoot policies. Some of those policies expressly require that the loss be accidental and that the property damage be neither expected nor intended; others do not. For example, the general liability policies issued prior to 1967 do not contain an express requirement that the property damage be neither expected nor intended. The comprehensive general liability policies that London sold to Zidell after 1967, however, provide that London will pay "all sums

which the insured shall become legally obligated to pay as damages because of * * * property damage * * * caused by an occurrence." Those policies contain something similar to the following definition of "occurrence":

> " '[O]ccurrence' means an accident, including continuous or repeated exposure to conditions, which results in * * * property damage *neither expected nor intended from the standpoint of the insured.*"[6]

(Emphasis added.)

Before trial, Zidell sought various rulings from the trial court concerning the expected or intended language, including a ruling that "the insurance company defendants carry the burden of proving the facts supporting denial of coverage on the basis of 'expected or intended.' " More specifically, Zidell argued that the expected/intended language in the policies operates as an *exclusion* to coverage and that Oregon courts have placed the burden of proving such exclusions on the insurer. London, in response, argued (1) that all of the insurance policies contained either an implicit or explicit "fortuity" requirement—*i.e.*, a requirement that the damage be neither expected nor intended; (2) that, because Zidell filed the declaratory judgment claim, it had the burden of proving its affirmative allegations that the environmental contamination was unexpected and unintended as to all policies; and (3) that certain policies contained explicit language that required Zidell to prove an accident or occurrence as part of the grant of coverage.

The trial court ultimately agreed with London that each of the policies at issue contained either an express or implied requirement that the harm be unexpected and unintended.[7] The court, however, placed the burden on London to prove that the environmental contamination was expected or intended under all of the policies and rejected London's argument that Zidell, as the plaintiff on the declaratory judgment claim, had the burden of proving its affirmative allegations.

---

[6] By contrast, certain bumbershoot policies provide coverage for an "occurrence," which is defined in the policies as "one happening or series of happenings, arising out of or due to one event taking place during the term of this policy."

[7] The exceptions were the bumbershoot policies, which are discussed later with respect to London's fourth assignment of error, 222 Or App at 481-86.

Also, in a letter opinion, the court explained its view that the Oregon appellate courts had treated the "expected or intended" language as an exclusion from coverage, regardless of whether that language appeared in the policy as a grant of coverage or an exclusion:

> "[T]he best indication I have so far, is that the combination of [*Ledford v. Gutoski*, 319 Or 397, 399, 877 P2d 80 (1994)] and [*State Farm Fire & Cas. v. Reuter*, 299 Or 155, 158, 700 P2d 236 (1985)], lead me to believe that even if 'expected or intended' language occurs in the grant of coverage, our Oregon Courts are treating it as an exclusion. I far prefer the thought and analysis of [*Queen City Farms v. Central Nat. Ins. Co.*, 126 Wn 2d 50, 882 P2d 703, 715-16 (1994)], but think our Oregon Courts have spoken."[8]

London later reraised the issue in a motion to dismiss Zidell's claims under ORCP 54 B, arguing that Zidell had the burden of proving that it neither intended nor expected to cause the loss and that Zidell had not met its burden. At that point, London argued that "now that the insurance polices are in evidence, none of the fortuity language is in an exclusion, therefore it is within the grant of coverage." The court denied the motion and adhered to its view that London "still [had] the burden of proof because it is an exception to the grant of coverage even though it is located in the same section as the grant of coverage and not in the exclusion section of the policy."

The assignment of the burden of proof, as it turned out, was pivotal in this case. In denying the motion to dismiss Zidell's claims, the trial court stated, "And I would find that as a matter of fact that Zidell, if they have the burden, has not met the burden of showing that it is neither expected nor intended. I don't think they have the burden, but * * * if they have it, they haven't shown it."

---

[8] In *Queen City Farms*, the court placed the burden of proof on the insured to demonstrate that the loss was "unexpected or unintended." 126 Wn 2d at 71, 882 P2d at 715. The court explained that, because virtually all language in a general liability policy that follows the insurer's promise to pay "all sums" can be described as "exclusionary," "the argument that the 'unexpected or unintended' language is exclusionary is not a particularly strong argument when deciding who has the burden of proof on this issue * * *." *Id.*

On appeal, London reprises its arguments that the trial court incorrectly allocated the burden of proof concerning "expected or intended" loss. It again argues that (1) the existence of an "unintended and unexpected" loss was part of the grant of coverage and was therefore a matter that Zidell was required to prove; and (2) alternatively, Zidell had the burden of proof on all policies, because "the party who brings an action for declaratory relief bears the burden of proving its affirmative allegations."

■        We begin with the question whether the express or implied "unexpected and unintended" requirement in the policies is more properly characterized as part of the grant of coverage or an exclusion. As we discussed in *Employers Insurance of Wausau v. Tektronix, Inc.*, 211 Or App 485, 509, 156 P3d 105 (2007), *rev den*, 343 Or 363 (2007), that inquiry is critical to the allocation of the burden of proof:

> "Under Oregon law, the initial burden of proving coverage is on the insured. *Lewis v. Aetna Insurance Co.*, 264 Or 314, 316, 505 P2d 914 (1973). Conversely, the insurer has the burden of proving that the policy excludes coverage. *Stanford v. American Guaranty Life Ins. Co.*, 280 Or 525, 527, 571 P2d 909 (1977)."

Thus, if the requirement that loss be neither "expected nor intended" is an "exclusion," the burden is on London to prove that the loss was intentionally caused. *See Reuter*, 299 Or at 159 n 3 (noting that, where "the insurance policy excludes coverage for 'bodily injury * * * which is either expected or intended from the standpoint of the insured[,]' " the insurer "has the burden of proving the applicability of its exclusion").

The trial court, as noted above, concluded that the Oregon appellate courts have consistently treated the "fortuity" requirement—*i.e.*, the requirement that the loss be "unexpected and unintended"—as an exclusionary clause, regardless of the precise manner in which the policy is crafted. On appeal, Zidell advances that same argument, initially relying on a number of cases in which the Oregon appellate courts have treated insurance policy provisions

covering accidents identically to provisions excluding coverage for intentionally caused losses. For the reasons that follow, we are not persuaded that any of those cases controls the issue before us.

In *Nielsen v. St. Paul Companies*, 283 Or 277, 583 P2d 545 (1978), the insured filed an action against his insurer to recover the amount that the insured paid to settle a claim against him, plus the cost of defending the claim. Under the terms of the insured's policy, the insurer was obligated to defend and indemnify the insured for damages caused by an "occurrence." The policy defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage *neither expected nor intended from the standpoint of the Insured.*" *Id.* at 279 (emphasis added). The insurer refused the insured's tender on the ground that the complaint against the insured was based upon the intentional, willful, and malicious misconduct of the insured.

In determining whether the insurer had breached its duty to defend, the Supreme Court explained that "[i]nsurance coverage for the protection of one who intentionally inflicts injury upon another is against public policy, and whether the insurer is relieved for this reason from the defense of an action against its insured depends upon the allegations of the complaint." *Id.* at 280-81. The court then observed, "It is not sufficient that the insured's intentional, albeit unlawful, acts must have been committed for the purpose of inflicting the injury and harm *before either a policy provision excluding intentional harm applies or the public policy against insurability attaches.*" *Id.* at 281 (emphasis added).

In *Ledford v. Gutoski*, 319 Or 397, 401, 877 P2d 80 (1994), the insurer similarly refused to defend under a policy that provided coverage for an "occurrence," which was defined in the policy as an accident that results in "bodily injury or property damage neither expected nor intended from the standpoint of the Insured[.]" Once again, the issue was whether the conduct alleged in the complaint "falls outside the coverage in that policy because the damage suffered was either intended or expected * * *." *Id.* at 401. Before

answering that question, the court observed that, regardless of the language used in a particular policy, Oregon courts had applied the same test to determine whether "intentionally-caused injuries" were covered by the policy:

> "Despite variations in the language of the policies, this court has interpreted various policy provisions excluding insurance coverage for intentionally-caused injuries similarly. *See, e.g., Allstate Ins. Co. v. Stone*, 319 Or 275, 277, 876 P2d 313 (1994) (policy excluding 'bodily injury or property damage caused intentionally by, or at the direction of, an insured person'); *Snyder v. Nelson/Leatherby Ins.*, 278 Or 409, 413, 564 P2d 681 (1977) (policy covering injuries 'caused by accident'); *Nielsen* * * *, 283 Or at 279 (policy covering 'bodily injury or property damage neither expected nor intended from the standpoint of the Insured'). *Cf. Isenhart v. General Casualty Co.*, 233 Or 49 at 53[, 377 P2d 26 (1962)] (applying same analysis to policy without provision excluding coverage for intentionally-inflicted injuries because coverage of such injuries would be against public policy). Injuries resulting from intentional acts are excluded from insurance coverage when the insured intended to cause the particular injury or harm, as opposed to merely intending the act. *E.g., Allstate Ins. Co. v. Stone*, *supra*, 319 Or at 278."

*Ledford*, 319 Or at 401. The court then explained that,

> "[f]or an exclusion from insurance coverage for intentional conduct to apply, '[i]t is not sufficient that the insured's intentional, albeit unlawful, acts have resulted in unintended harm; the acts must have been committed *for the purpose of inflicting the injury and harm* before either a policy provision excluding intentional harm applies or the public policy against insurability attaches.' *Nielsen*, 283 Or at 281 (emphasis added)."

*Ledford*, 319 Or at 401-02 (second brackets in original). In short, the court in *Ledford* not only described the "neither expected nor intended" language in the definition of "occurrence" as an "exclusion," but it also expressly acknowledged that the same analysis is used to determine whether intentionally caused loss is covered by the policy, regardless of whether the policy language covers accidental losses or specifically excludes intentional harm.

This court, too, has equated the meaning of policy language covering accidental losses and language excluding intentionally caused losses. For example, in *Farmers Ins. Co. v. Limbocker*, 109 Or App 130, 818 P2d 527 (1991), *rev den*, 312 Or 589 (1992), the insurer filed an action seeking a declaration that it had no duty to defend or indemnify its insured. The policy at issue provided that the insurer would pay "all damages from an occurrence which an insured is legally liable to pay because of bodily injury or property damage covered by this policy." *Id.* at 132 (emphasis omitted). The policy then defined an "occurrence" as a "sudden event, including continuous exposure to the same conditions, resulting in bodily injury or property damage neither expected nor intended by the insured." *Id.* at 133 (emphasis omitted). The trial court granted summary judgment in favor of the insurer on the ground that the insured's conduct was intentional and therefore not an "occurrence" within the meaning of the policy. We reversed, on the ground that there existed a genuine issue of material fact regarding the insured's intent. In reaching that conclusion, we explained that the allegation regarding the insured's conduct in the third-party complaint "would come within the *exclusion from coverage for intentional acts*." *Id.* at 133 (emphasis added). We proceeded to apply the analysis from *Nielsen* to determine whether the allegations in the third-party complaint were subject to more than one reasonable inference regarding the insured's intent.

Similarly, in *Minnis v. Oregon Mutual Ins. Co.*, 162 Or App 198, 986 P2d 77 (1999), *rev'd in part on other grounds*, 334 Or 191, 48 P3d 137 (2002), we examined the duty to defend under a policy that covered bodily injury resulting from an "occurrence," which the policy defined as an "accident, including continuous or repeated exposure to substantially the same harmful conditions." The policy also contained an "exclusion" for bodily injury "expected or intended from the standpoint of the insured." 162 Or App at 209. We held that, under either the "occurrence" definition or the intentional injury exclusion, the insurer had a duty to defend:

> "The policy does not define the term 'accident,' but we have recognized that the term usually means actions that are 'unforeseen, unexpected, unintended or the like.' *Safeco*

*Ins. v. House,* 80 Or App 89, 96, 721 P2d 862, *rev den*[,] 302 Or 86 (1986). When the term is defined in that way, the question whether a bodily injury was caused by an 'accident' and the question whether it was caused intentionally present two sides of the same coin. *See Fox v. Country Mutual Ins. Co.,* 327 Or 500, 515 n 11, 964 P2d 997 (1998) (recognizing that the same requirement applies in policies covering losses caused by accident and those excluding coverage for intentional losses); *Albertson's Inc. v. Great Southwest Fire Ins. Co.,* 83 Or App 527, 530-31, 732 P2d 916, *rev den*[,] 303 Or 332 (1987) (reasoning that cases interpreting the exclusion for intentional acts provide the appropriate measure for determining coverage of accidental injuries). In each instance, the question is not whether the conduct that caused the injury was intentional but whether the insured specifically intended to cause the injury that gives rise to coverage. *See Ledford,* 319 Or at 402; *Nielsen v. St. Paul Companies,* 283 Or [at] 280-81."

162 Or App at 210 (footnote omitted).

As the foregoing cases demonstrate, both the Supreme Court and this court have articulated a consistent standard for determining whether an act has satisfied the unexpected/unintended requirement of an insurance policy. That is, for purposes of determining the scope of an insurer's duties under a policy, the Oregon appellate courts have not distinguished between a grant of coverage for unexpected and unintended events on the one hand, and an exclusion for intentionally caused losses on the other: In both instances, the question is whether "the insured intended to cause the particular injury or harm, as opposed to merely intending the act." *Ledford,* 319 Or at 401.

That said, none of the above cases—or any other Oregon appellate case of which we are aware—has held that the unexpected/unintended language, even when set forth in the definition of occurrence, should be considered an exclusion for purposes of allocating the burden of proof. The burden of proof was not at issue in any of those cases, and whether the unexpected/unintended requirement was described as an exclusion rather than part of the grant of coverage was not relevant to the disposition in any of the above-discussed cases. Rather, in each of the cases that equated the meaning of the unexpected/unintended requirement in the

definition of occurrence or accident and the exclusion for intentionally caused loss, the question was *what* evidence satisfied the burden; none of the cases addressed, implicitly or explicitly, *who bore that burden.*[9]

In placing the burden of proof on London, the trial court also relied heavily on the Supreme Court's decision in *Reuter*. In *Reuter*, the insurer sought a declaration of its obligations to its insured for liability arising out of the insured's sexual assault of a third party. At the time of the assault, the insured "had a policy of liability insurance with State Farm which contained this exclusion: 'This policy does not apply * * * to bodily injury or property damage which is either expected or intended from the standpoint of the insured * * *.' " 299 Or at 157. The issue on appeal was primarily one of collateral estoppel; the insured had contended that he was not responsible for his actions by reason of mental disease or defect, but the jury had rejected the defense and found the insured guilty in the related criminal action.

In the process of analyzing one aspect of the collateral estoppel issue—namely, whether there was a final judgment on the merits in the criminal action—the court framed the issue as whether "an attack that was 'knowingly' committed [was] 'expected or intended' from the standpoint of the insured[.]" *Id.* at 159. The Supreme Court then explained that this court had answered that question in the affirmative and that the victim of the assault had not sought review of that holding. Accordingly, the court assumed that the conviction for an act "knowingly" committed necessarily meant that

---

[9] We further note that, in at least three cases, the Supreme Court has suggested that the definition of an occurrence in a general liability policy is, in fact, part of the grant of coverage rather than an exclusion. *See Oak Crest Constr. Co. v. Austin Mutual Ins. Co.*, 329 Or 620, 622, 998 P2d 1254 (2000) (describing the occurrence requirement as a coverage provision before concluding, on the summary judgment record, that the insured's claim did not arise from an accident as required by the definition of an occurrence); *St. Paul Fire v. McCormick & Baxter Creosoting*, 324 Or 184, 199 n 6, 923 P2d 1200 (1996) (noting that, where insurers did not dispute that the events at issue were occurrences, "as to the occurrence-based policies, if coverage is triggered, then coverage is provided for the harm alleged" (emphasis omitted)); *see also McCleod v. Tecorp International, Ltd.*, 318 Or 208, 213, 865 P2d 1283 (1993) (not reaching the question whether there was an occurrence within the meaning of the policy because coverage was precluded by an exclusion in any event).

the insured expects or intends to harm the victim. In a foot-note, the Supreme Court proceeded to describe an "interesting issue [that] lurks in this case." *Id.* at 159 n 3. In the context of discussing that issue—which the Supreme Court expressly stated had not been raised or briefed by the parties and was not being decided—the court offered the following *dicta*:

> "State Farm's insurance policy excludes coverage for 'bodily injury * * * which is either expected or intended from the standpoint of the insured.' State Farm has the burden of proving the applicability of its exclusion.
>
> "* * * * *
>
> "The interesting lurking question is whether a finding in [the victim's] favor on her claim that [the insured] was 'suffering from a mental disorder which * * * caused [the insured] to be unable to conform his conduct to the requirements of law' would necessarily bring [the victim's claim] within the policy coverage, for such a finding is not necessarily inconsistent with a finding that [the insured] was acting intentionally.
>
> "Other courts have addressed the effect of a finding of insanity or mental derangement within the meaning of similar intentional injury exclusions of other policies * * *."

*Id.* at 159 n 3.

Nothing in *Reuter* suggests that the court's *dicta* was intended to go beyond the burden of proof on the *exclusion* at issue in that case. That is, the opinion discusses only the intentional injury exclusion and offers no guidance as to whether the unexpected/unintended requirement should be considered an exclusion rather than part of the grant of coverage regardless of the policy language.[10]

---

[10] Similarly, in *State Farm Fire and Casualty Co. v. Green,* 139 Or App 51, 57, 911 P2d 357, *rev den,* 323 Or 691 (1996), we stated that, "[a]lthough an insurer that invokes an 'intentional acts' exclusion must prove its insured's subjective intent to injure, *Ledford,* 319 Or at 403, neither *Ledford* nor the earlier cases on which it relies hold that the insurer must prove an intent to harm a *specific* person." (Emphasis in *Green.*) The issue in *Green* was not the allocation of the burden of proof, but rather whether the requisite proof involved intent to injure a specific person as opposed to general intent to harm others. For that reason, *Green* does not inform the issue before us.

For all of the reasons expressed above, we disagree with the trial court's conclusion—and Zidell's arguments on appeal—that Oregon's appellate courts have already decided the question whether the unexpected and unintended requirement constitutes part of the grant of coverage or an exclusion from coverage for purposes of allocating the burden of proof. We turn, then, to that issue of first impression.

■ We begin by noting that, outside of Oregon, there is considerable disagreement among courts and commentators as to whether the unexpected and unintended requirement, when included in the definition of an occurrence, is part of the grant of coverage or is to be considered an exclusion. *See, e.g.,* Lee R. Russ and Thomas F. Segalla, 17A *Couch on Insurance,* § 254:53 (2001) (describing competing lines of cases and observing that "[i]t is generally difficult to reconcile these two lines of cases any way other than as an analytical disagreement as to whether the provision is a coverage provision or is to be considered an exclusion or exception").[11] We must determine which of those competing approaches is most consistent with existing Oregon law concerning the burden of proof in insurance cases generally.

■ Under Oregon law, the purpose of an exclusion in an insurance policy is to eliminate coverage that, were it not for the exclusion, would otherwise exist. *See Yosemite Insurance Co. v. Meisner,* 277 Or 519, 561 P2d 185 (1977) (purpose of an exclusion is to remove certain situations from coverage); *Cimarron Ins. Co. v. Travelers Ins. Co.,* 224 Or 57, 61, 355 P2d 742 (1960) ("The purpose of an exclusion clause is the opposite of that of a coverage clause. * * * [T]he effect of an exclusion clause is to deny the protection of the policy to some one who, but for the denial, would be an insured."); *see also Cherkezov v. Universal Underwriters,* 49 Or App 741, 745, 621 P2d 588 (1980), *rev den,* 290 Or 853 (1981) ("Where the exclusion applies, coverage which would otherwise exist

---

[11] *See also* Barry R. Ostrager and Thomas R. Newman, *Handbook on Insurance Coverage Disputes,* § 803[e], 286 (6th ed 1993) ("Courts have split on the issue of whether the insured or the insurer has the burden of proving that damage was expected or intended from the standpoint of the insured within the meaning of the 'occurrence' definition. The result generally depends on whether the court views the 'expected or intended' requirement as part of the coverage definition or an exclusion from coverage.").

under the insuring agreements, including the omnibus clause, is negated."). Conceptually, then, the coverage provisions of an insurance policy define the universe of claims that are covered by the policy; the exclusions constitute a subset of claims that, although within that universe of covered claims, are nonetheless excluded.

Considering the issue in that light, we conclude that the unexpected and unintended requirement—when expressly appearing in an insurance policy as part of the definition of a triggering event—is more properly considered part of the grant of coverage.[12] As set out above, some of the policies at issue in this case explicitly cover an occurrence and define an "occurrence" to mean "an *accident,* including continuous or repeated exposure to conditions, which results in * * * property damage *neither expected nor intended from the standpoint of the insured.*" (Emphasis added.) Thus, the triggering event for coverage under those policies is an accident that results in unexpected and unintended property damage. Said another way, the universe of covered claims consists only of accidental events, and to establish a *prima facie* case under those policies, Zidell must allege and prove that such a triggering event occurred.

For that reason, we conclude that the trial court erred in allocating to London the burden of proving that property damage at the Moody Avenue site was unexpected and unintended under those insurance policies that, by their express terms, cover only occurrences defined as accidents that result in unexpected and unintended damage. As the party seeking the benefit of the provision of the contract that provides coverage for such an occurrence, Zidell had the burden of proving that the damage for which it sought coverage was unexpected and unintended. *See Employers Insurance of Wausau,* 211 Or App at 514 (explaining that, "in the context of contractual disputes, Oregon courts have required the party seeking the benefit of a particular provision to bear the burden of proving its application"). The trial court's ruling

---

[12] Once again, Zidell does not challenge on appeal the trial court's conclusion that all of the policies, with the exception of the bumbershoot policies, contained either an express or implied requirement that the loss be unexpected and unintended.

effectively required London to *disprove* that the loss came within policy language granting coverage, contrary to Oregon law. *See Stone v. Beneficial Standard Life*, 272 Or 129, 130, 535 P2d 764 (1975) (where beneficiary seeks to recover under life insurance policy that covers accidents, beneficiary "must show that it was more probable than not that [the insured] was killed in a vehicle-related accident"); *LaBarge v. United Ins. Co.*, 209 Or 282, 300, 306 P2d 380 (1957) (where insured seeks the benefit of a double indemnity provision in a life insurance policy, "[i]t is always the burden of the insured to establish that the accidental trauma was the cause of his disability"); *Stuart v. Occidental Life Ins. Co.*, 156 Or 522, 527-28, 68 P2d 1037 (1937) ("[P]laintiff has the burden of establishing, as a part of her case, the death of her husband resulting from an accidental injury of the kind covered by the contract."); *cf. Shaver Co. v. Eagle Star Ins. Co.*, 172 Or 91, 114, 139 P2d 769 (1943) (in an action on a marine insurance policy, "burden was on the [insured] throughout the case to prove that the loss resulted from a cause insured against").

We reach a different conclusion, however, with respect to those policies that do not expressly require an accident as the trigger for coverage. As noted above, the trial court concluded that, under Oregon law, even those insurance policies that do not expressly require an accident included an "implied fortuity" requirement. The trial court reasoned that, under Oregon insurance statutes in effect before 1967, the policies covered only unintended and unexpected damage as a matter of law. Specifically, the trial court relied on Oregon Laws 1917, chapter 203, section 1, which defined insurance as "a contract whereby one undertakes to indemnify another against loss, damage or liability arising from an unknown or contingent event, whereby the insured or his beneficiary suffers loss or injury." In the trial court's view, based on the statutory definition, the insurance policies issued before 1967 necessarily encompass only damages that were unexpected and unintended. Zidell does not challenge that ruling on appeal, and we assume for the sake of this assignment of error that the trial court was correct to apply an "implied fortuity" doctrine.

As the Supreme Court recognized in *A-1 Sandblasting & Steamcleaning Co., Inc. v. Baiden*, 293 Or 17, 20, 643 P2d

1260 (1982), the principle that an insured cannot be indemnified for intentional wrongdoing "is variously based on specific policy provisions, or on 'the very nature of insurance,' or on public policy." Where the language of the policy itself does not impose such a limitation, the court considers "whether Oregon law *precludes recovery if the losses resulting from those operations otherwise were within the coverage of the insurance contract." Id.* at 21 (emphasis added).

■      If an insurance policy does not, by its express terms, limit the scope of coverage to accidental events causing loss that is neither expected nor intended, the insurer must implore the court to supply that restriction. Stated another way, where the insured is able to demonstrate that the loss would otherwise fall within the plain language of the policy, the insurer can prevail only by demonstrating that a policy provision or exclusion is implied by operation of law. In that instance, the assertion that damage is not unexpected or unintended—and therefore cannot be within the grant of coverage—is entirely defensive in character, given that the plain text of the policy does not restrict coverage in that way. Accordingly, we conclude that, where the insurer seeks to somehow limit coverage based on a fortuity requirement that does not appear in the text of the policy itself, the burden falls on the insurer to prove the applicability of an implied fortuity doctrine as a defense to coverage. For that reason, the trial court did not err in requiring London to prove that the damage at the Moody Avenue site was unexpected and unintended with respect to those policies that do not, by their express terms, restrict coverage in that way.[13]

With the above understanding of the respective burdens, we turn to London's contention that Zidell, as the plaintiff in the declaratory judgment action, had the burden of proving that the property damage at the Moody Avenue site was unexpected and unintended. In support of that argument, London relies primarily on the following footnote in *Reuter*, 299 Or at 166 n 9:

---

[13] We recognize that, because Zidell has pleaded only two claims that encompass multiple (and different) policies, the varying burden of proof seems somewhat awkward in this case. Nonetheless, the policies are different, and the rights and obligations of the parties under each policy must be analyzed separately.

> "State Farm chose to make a preemptive strike by filing a declaratory judgment action against [the insured's victim] and [the insured]. As plaintiff, it had the burden of proving noncoverage. *First National Bank v. Malady*, 242 Or 353, 358, 408 P2d 724, 726 (1966). It could have waited until [the insured's victim] obtained judgment against [the insured] and garnished State Farm or waited until [the insured's victim] sued State Farm * * *, in which event [the insured's victim] would have had the burden of proving coverage."

According to London, that same principle applies to an insured seeking a declaration of coverage: Because Zidell made a preemptive strike and sought a declaration of coverage for unexpected and unintended damage, it had the burden of proving that the damage to the Moody Avenue site was unexpected and unintended.

■ We reject London's argument that an insured's burden of proving coverage somehow shifts when the insured is a plaintiff in a declaratory judgment action. In *Reuter* and its progeny, Oregon's appellate courts have held that an insurer seeking a declaration that a particular loss is *not* covered bears the burden of proving its allegations in that regard— *i.e.*, the burden of proving that a loss falls outside the scope of coverage or within the scope of an exclusion. We are not aware of any Oregon appellate decision in which an *insured* seeking a declaration of coverage has been required to negate an insurer's potential defenses to coverage, nor has London provided any persuasive argument as to why that should be the case.

In sum, we conclude that the trial court erred in allocating the burden of proof on the issue of unexpected and unintended damage to London as to those insurance policies that expressly require Zidell to prove an accident that results in unexpected and unintended damage. However, we conclude that the trial court did not err in allocating the burden of proving that damage was expected or intended to London as to those policies for which the court invoked an implied fortuity doctrine.

Before turning to London's second assignment of error, we briefly address London's argument that the trial court's error in allocating the burden of proof actually

requires entry of judgment in London's favor. London argues that, because the trial court made a contingent factual finding—namely that, had the burden been on Zidell, the court "would find as a matter of fact that Zidell has * * * not met the burden of showing that it is neither expected nor intended"—this court should accept that factual finding on appeal.

We disagree. It is not clear from the record that the trial court's "finding" in that regard—which was never memorialized in the trial court's extensive factual findings—was intended to be anything more than an offhand remark. *See Kallstrom v. Kallstrom*, 265 Or 481, 484, 509 P2d 1195 (1973) ("Antecedent remarks of the trial court which are not incorporated into the written findings or judgment are not considered to be findings of fact subject to review by this court."). In fact, it appears that the omission of that finding from the court's written findings of fact was intentional. At a subsequent hearing regarding the factual findings, the parties discussed the court's previous remark that Zidell had not met its burden of proof; after some discussion of the matter, including a discussion of the possibility that the case would have been tried differently had the burden been allocated to Zidell, the finding was omitted. The court then remarked that, if the burden of proof issue were reversed on appeal, "probably we'll retry it." Thus, even assuming that it would otherwise be proper to rely at this stage on an alternative finding of fact, we decline to elevate the trial court's remark to the status of such a finding. Rather, we conclude that the proper remedy is simply to reverse and remand for a new trial on Zidell's breach of contract and declaratory judgment claims.

### b. Dismissal as a matter of law

In its second assignment of error, London contends that, regardless of who had the burden of proof, the trial court erred in failing to conclude that the damage for which Zidell sought coverage was, as a matter of law, expected or intended. According to London, the trial court should have granted its motion to dismiss under ORCP 54 B(2),[14] because

---

[14] ORCP 54 B(2) provides:

"After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving

the only reasonable inference from Zidell's conduct is that it intended and expected to cause damage at the Moody Avenue site. We review the denial of a motion to dismiss pursuant to ORCP 54 B(2) "for legal error, inquiring whether the evidence in the trial record establishes a *prima facie* case." *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 323, 129 P3d 773, *rev den*, 341 Or 366 (2006).

As discussed above, the trial court's pretrial ruling assigned the burden of proof to London on the question whether the damage was unexpected and unintended and effectively determined that Zidell was not required to prove that the damage was unexpected and unintended as part of its *prima facie* case. That pretrial ruling, which the court adhered to with respect to London's ORCP 54 B(2) motion, doomed that motion for judgment as a matter of law; if the unexpected and unintended issue was not part of plaintiff's *prima facie* case, London would not have been entitled to prevail as a matter of law based on Zidell's evidence alone. Our reversal of the trial court's ruling as to the burden of proof complicates—if not obviates—our review of London's second assignment of error. As the parties discussed below, it is possible that Zidell would have tried the case differently had the burden been assigned to it rather than London. For that reason alone, it would be improper to conclude on appeal that the trial court should have granted a motion regarding Zidell's failure to make the wrong *prima facie* case.

In any event, we disagree with London's argument that the trial court was required, on the record before it, to conclude that the damage for which Zidell sought coverage was, as a matter of law, expected or intended. The gravamen of London's argument under its second assignment of error is that Zidell indisputably knew that *some* harm would result from its activities, such as dumping oil, discharging paint that was by its very design toxic to marine life, and violating

the right to offer evidence in the event the motion is not granted, may move for a judgment of dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment of dismissal against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment of dismissal with prejudice against the plaintiff, the court shall make findings as provided in Rule 62."

state and federal clean water laws. Although we agree that there is evidence in the record from which a trier of fact could have determined that Zidell expected and intended the damage for which it sought coverage, that is not the question before us. Nor is the question before us whether Zidell *should have* expected or intended environmental damage from its activities. Rather, as the Supreme Court has explained in the context of expected and intended harm, the question is whether Zidell had the *subjective intent* to cause injury and harm to the property at the Moody Avenue site. *Allstate Ins. Co. v. Stone*, 319 Or 275, 279, 876 P2d 313 (1994) (explaining that the court has rejected the "objective 'natural and ordinary' consequences approach to applying exclusions for intentionally-inflicted harms"); *see also Nielsen*, 283 Or at 281 ("[T]he acts must have been committed *for the purpose of inflicting the injury and harm* before either a policy provision excluding intentional harm applies or the public policy against insurability attaches.").

■     An insured's subjective intent to inflict harm can be established as a matter of law if the insured "engaged in an act so certain to cause a particular kind of harm that the court will say that the insured intended the harm." *Fox v. Country Mutual Ins. Co.*, 327 Or 500, 514, 964 P2d 997 (1998) (citing *Snyder v. Nelson/Leatherby Ins.*, 278 Or 409, 413, 564 P2d 681 (1977)). "In other words, the court should only infer that the insured had a subjective intent to cause harm or injury as a matter of law when such subjective intent is the *only* reasonable inference that may be drawn from the insured's conduct." *Allstate Ins. Co.*, 319 Or at 279; *see also Nielsen*, 283 Or at 281 ("There are some intentional acts the nature of which is such that it must necessarily be concluded that there was an intention to injure."). London argues that Zidell's acts fall into that category.

■     We are not persuaded that any of Zidell's acts were, by their very nature, sufficient to establish *as a matter of law* that Zidell acted with the purpose of causing harm. The Supreme Court and this court have found intent to injure, as a matter of law, only where such an intent was inherent in the insured's conduct. *See, e.g., Mutual of Enumclaw v. Merrill*, 102 Or App 408, 411-12, 794 P2d 818, *rev den*, 310 Or 475 (1990) (intent to injure inferred as a matter of law where

the insured sexually molested his minor granddaughter); *Falkenstein's Meat Co. v. Maryland Casualty Co.*, 91 Or App 276, 280, 754 P2d 621 (1988) (tort of deceit, by its nature, is an action from which the intention to do harm must necessarily be inferred"). Otherwise, the matter of intent is a question for the trier of fact, even where the consequences of the insured's actions seem all but certain. *See, e.g., A-1 Sandblasting*, 293 Or at 26 ("The choice to paint the bridge by methods and under conditions expected to cause some compensable harm was intentional, as the insurer asserts, but it was not the kind of purposeful infliction of injury that excludes recovery of indemnity * * *."); *Snyder*, 278 Or at 415-16 (where the insured intentionally rammed the injured party's car, there was "a permissible but not necessary inference to draw from [the insured's] actions and [therefore] a legitimate question of fact as to whether [the insured] intended the injuries and damage"); *City of Burns v. Northwestern Mutual*, 248 Or 364, 370-72, 434 P2d 465 (1967) (intent not inferred as a matter of law where the city moved the decedent's grave without securing his wife's consent as required by statute). Zidell's acts of disposing of toxic substances are more analogous to the latter cases than to those in which intent is inferred as a matter of law.

We are not persuaded that the *only* inference available to the trier of fact was that Zidell purposefully caused damage, or that Zidell engaged in acts so certain to cause harm that intent to injure must be inferred as a matter of law. We therefore reject London's second assignment of error.

    c.  Factual findings regarding expected and intended damage

In its third assignment of error, London contends that the trial court failed to enter judgment consistent with its factual findings concerning post-1960 policies. According to London, the court found that Zidell had known since 1961 that the waste that it was disposing of into the river was toxic to marine life, but the judgment entered is inconsistent with that finding. Because we reverse and remand the judgment for trial on both claims under London's first assignment of error, we need not address this assignment of error.

### d. Fortuity requirement in the bumbershoot policies

London's fourth assignment of error concerns the bumbershoot policies issued in 1970 and 1971. Because it presents an issue likely to arise on remand, we address that issue despite the fact that both of Zidell's claims must be retried. The trial court ruled that the bumbershoot policies cover *expected* losses, as long as those losses are unintended. On appeal, London argues that the policies implicitly cover only *unexpected* losses. According to London, the bumbershoot policies are marine insurance policies and are therefore governed by federal admiralty law; "[t]he well-settled rule under federal maritime law," London argues, "is that marine insurance policies cover only fortuitous losses." Alternatively, London argues that, even if admiralty law does not impose that requirement, Oregon law requires that the loss be unexpected.[15]

■■ Initially, we agree with London that the bumbershoot policies are marine insurance policies; Zidell does not seriously contend otherwise.[16] We also agree with London's contention that federal admiralty law applies to marine insurance where there exists an established, controlling federal rule. *Wilburn Boat Co. v. Fireman's Ins. Co.*, 348 US 310, 314-16, 75 S Ct 368, 99 L Ed 337 (1955). That said, we are not persuaded that any established principle of admiralty law limits coverage in a bumbershoot policy to damage that is unexpected.

---

[15] London also argues that Zidell admitted in its complaint that the bumbershoot coverage extends only to unexpected and unintended loss. We disagree. Zidell alleged that the bumbershoot coverage required London to indemnify it for protection and indemnity risks and all other sums that Zidell is legally liable to pay on account of property damage existing during the policy periods. Zidell further alleged that London had a duty to defend Zidell for claims against it alleging the possibility of unexpected and unintended third-party property damage. The fact that Zidell alleged that the property damage was unintended and unexpected is not an admission *that the bumbershoot coverage requires that it be so*. We reject London's arguments in that regard without further discussion.

[16] *See also Glossary of Marine Insurance and Shipping Terms*, 14 USF Mar LJ 308, 325 (2002) (A "bumbershoot" is "[a] marine insurance policy covering multiple liability coverages in excess of one or more different underlying policies (comparable to the Commercial Liability Umbrella covering liabilities on land). 'Bumbershoot' is the English word for 'Umbrella'; i.e., 'all encompassing.' ").

London cites a number of cases and treatises for the proposition that marine insurance policies cover only fortuitous losses. *See, e.g., Standard Oil Co. v. United States*, 340 US 54, 58 n 9, 71 S Ct 135, 95 L Ed 68 (1950) ("Ordinary marine insurance covers losses due to fortuitous perils of the sea."). As the court explained in *Youell v. Exxon Corp.*, 48 F3d 105, 110 (2nd Cir 1995), *vac'd on other grounds*, 516 US 801, 116 S Ct 43, 133 L Ed 2d 9 (1995), *adhered to on remand,* 74 F3d 373 (2nd Cir 1996), *cert den*, 517 US 1251 (1996), "[f]ederal courts sitting in admiralty have been applying some variation of the fortuity rule in marine insurance cases for over a hundred years." London, however, has not cited any cases in which federal courts have held that the fortuity rule excludes marine insurance coverage for expected but unintended losses.[17]

Indeed, in *Youell*, the court essentially recognized that there is no *established* federal rule in that regard. *Youell* involved a dispute between Exxon and its insurers over coverage for damage arising out of the grounding of the *Exxon Valdez* oil tanker. The insurers moved to dismiss the action on the ground that the federal district court should abstain from deciding the case while a parallel action was proceeding in state court. On appeal, one of the issues, for purposes of deciding the preemption question, was whether "the fortuity rule is an admiralty rule [that] exempts a marine insurer from having to cover losses caused by the insured's recklessness." *Id.* at 110. Specifically, the insurers argued that, if they could prove that Exxon recklessly allowed a known alcoholic to pilot the *Valdez* and that the recklessness caused the grounding, the federal fortuity rule would relieve them of liability. *Id.* at 110.

In deciding that issue, the court first concluded that the application of the fortuity rule was, in fact, an issue of admiralty law. *Id.* at 110. The court concluded, however, that

---

[17] To avoid any apparent inconsistency, we note that the parties have used the term "fortuity requirement" as convenient shorthand for the requirement that loss be "unexpected and unintended"; with the exception of London's fourth assignment of error, the parties do not argue about whether "fortuity" in fact encompasses expected but unintended harm. This assignment of error, however, presents the question whether a "fortuity rule" in maritime law does, in fact, preclude coverage for "expected" but unintended loss.

there was no controlling federal case law that extended the fortuity rule to recklessness. The court explained that, "[w]hile negligent losses are fortuitous, and wilful ones are not, admiralty courts have yet to assign losses caused by the insured's own reckless conduct to either camp." *Id.* at 110. As the court observed,

> "The concept of recklessness does not lend itself to easy characterizations as either negligent or wilful conduct. Recklessness implies that 'the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.' * * * As such, recklessness falls somewhere 'between intent to do harm, which * * * includes proceeding with knowledge that the harm is substantially certain to occur, and the mere unreasonable risk of harm to another involved in ordinary negligence.' * * * In other words, recklessness lies in the mists between mere negligence and wilful misconduct."

*Id.* at 110-11. Although admiralty courts had not decided the issue, the court reasoned that, because fortuity is an issue of federal admiralty law, the district court should not have dismissed the case on abstention grounds: "[A] federal question of first impression must all but demand that the federal court hear the case." *Id.* at 111-12.

The question presented to us—whether a principle of admiralty law precludes recovery for expected but unintended loss—strikes us as substantively similar to the issue of first impression identified but not decided in *Youell*. Expected but unintended losses are akin to recklessly caused losses; the insured expects that some loss is highly probable to result from his or her intentional conduct, but the insured proceeds to act in the face of that expectation of harm. For that reason, we conclude that there is no established and controlling rule of admiralty law that excludes marine insurance coverage for expected but unintended damage.[18]

---

[18] London argues that the Oregon Supreme Court, in *Shaver Co. v. Eagle Star Ins. Co.*, 172 Or 91, 139 P2d 769 (1943), concluded that "marine policies do not provide insurance for expected events but instead cover only 'fortuitous and unexpected' events[.]" We disagree with that reading of *Shaver*. The court in *Shaver* did not address whether an unintended but expected loss is excluded from coverage

In the absence of an established and controlling federal principle on that question, we turn to London's argument that such a limitation on marine insurance is imposed under applicable state law principles. *See Wilburn*, 348 US at 320-21 (in the absence of an established federal admiralty rule, regulation of marine insurance should be left with the states). In that regard, London argues that such a limitation should be implied in marine insurance by virtue of the definition of insurance in ORS 731.102(1) (" 'Insurance' means a contract whereby one undertakes to indemnify another or pay or allow a specified or ascertainable amount or benefit upon determinable risk contingencies.").

We are not persuaded that the definition of insurance in ORS 731.102 somehow writes into the bumbershoot policies a requirement that the loss be unexpected. ORS 731.102 defines what types of agreements between an insured and an insurer constitute insurance for purposes of Oregon statutes; it does not purport to impose particular requirements on an insurance policy or decide which terms are enforceable. *Sanders v. Oregon Pacific States Ins. Co.*, 314 Or 521, 527, 840 P2d 87 (1992) ("Those definitions [including ORS 731.102] are intended primarily to designate and define classes of insurance for administrative purposes, such as the granting of certificates of authority to sell particular classes of insurance."). Nor does London suggest that any particular language in the bumbershoot policies should be construed to impose the requirement that a loss be unexpected.

Accordingly, we are left to consider whether such a requirement should be imposed as a matter of public policy. On that score, the Supreme Court's decision in *A-1 Sandblasting* is controlling. In *A-1 Sandblasting*, the plaintiff, a contractor who cleaned and painted large structures, filed an action against its insurer to recover sums that the contractor had paid to the owners of cars that were damaged while the contractor was spray painting a bridge. The insurer obtained summary judgment on the ground that an exclusion

---

under the admiralty fortuity rule; rather, the court concluded that waves from a passing vessel were "something to be expected and guarded against" and were therefore not "perils of the river" within the meaning of a marine insurance policy. 172 Or at 107.

in the policy precluded coverage. This court reversed on the ground that the exclusion was ambiguous, and the Supreme Court agreed with that conclusion. The Supreme Court, however, did not end its analysis at that point; instead, the court considered whether recovery was precluded "under a general principle disallowing indemnity against liability for intentional wrongdoing." 293 Or at 20. The court explained:

> "The case nevertheless would not need to be remanded for trial if the harmful conduct for which plaintiff became liable precludes recovery under a general principle disallowing indemnity against liability for intentional wrongdoing. In the law of liability insurance, this general principle is variously based on specific policy provisions, or on 'the very nature of insurance,' or on public policy. *See* Keeton, *Insurance Law* 288-289 (1971). Because such insurance contracts traditionally covered liability arising from 'accidents' or expressly excluded liability for intentional acts, most decisions denying recovery have not had to go beyond the limits explicit or implicit in the contract and squarely to hold insurance covering liability for intentional acts to be an unlawful contract. There may be a question how far the case law interpreting older policies was superseded, intentionally or otherwise, by the 1966 change in a new standard liability policy, which substituted the term 'occurrence' for 'accident' in the key coverage clause (though retaining 'accident' as part of the definition of 'occurrence' at least for some purposes). The insurance contract found in the present record, however, consists primarily of typewritten provisions of a policy issued by defendant underwriters at Lloyd's, London, which refer neither to 'accidents' nor to the legal premise of the liability against which the policy protects the insured. *If any policy provisions or prior interpretations of similar insurance policies exclude coverage of this insured's operations, other than the exclusion previously referred to, defendants have not cited them. We therefore turn to the question whether Oregon law precludes recovery if the losses resulting from those operations otherwise were within the coverage of the insurance contract.*"

293 Or at 20-21 (footnote omitted; emphasis added).

Ultimately, the court declined to impose a blanket rule that would preclude recovery for highly expectable losses, because the relevant public policy concerns were more properly evaluated by the legislature:

> "Legislators can make such policy judgments on empirical or on political grounds, but the court has been presented with nothing within the reach of judicial notice to show that liability insurance would have a greater 'evil tendency' to promote tortious or otherwise unlawful operations *when it covers expected, though undesired, negligently caused injuries.*"

293 Or at 23-24 (footnote omitted; emphasis added). Thus, the court rejected the argument that public policy prohibits recovery of expected but unintended losses.

We similarly conclude in this case that the allocation of risks for expected but unintended damage is a matter best left to the parties and to the legislature. For that reason and the others stated above, we conclude that the trial court did not err in declining to impose an implicit requirement that losses under the bumbershoot policies be unexpected as well as unintended.

### 2. *Additional scope of coverage issues*

#### a. Protection and indemnity coverage

In its fifth assignment of error, London contends that the trial court erred in concluding that Zidell was entitled to protection and indemnity (P&I) coverage under various marine insurance policies.[19] London advances two alternative arguments in support of its fifth assignment of error: (1) that none of the liability for which Zidell seeks coverage will arise "by reason of interest" in a vessel; and (2) none of the marine policies covers liability for soil beneath or adjacent to the river. Because we agree with London that the policies by their terms do not cover damage to soil beneath or adjacent to the river, we address only that argument.[20]

P&I coverage is the primary form of liability insurance for vessels. The P&I clauses at issue in this assignment of error provide that London will indemnify Zidell as follows:

---

[19] This issue, too, is likely to arise on remand, and we therefore address it.

[20] We understand London's arguments under its fifth assignment of error to constitute alternative reasons as to why Zidell is not entitled to coverage for environmental contamination to soil and groundwater under the P&I coverage, and we therefore address only its second argument in that regard.

"It is further agreed that if *by reason of interest in the Vessel* the Assured shall become liable to pay and shall pay any sum or sums in respect of any liability, claim, demand, damages, and/or expenses arising from or occasioned by any of the following matters or things during the currency of the Policy, that is to say: —

"Loss of or damage to any other vessel or goods, merchandise, freight, or other things or interests whatsoever, on board such other vessel, caused proximately or otherwise by the Vessel insured in so far as the same is not covered by Clause 1 :

"Loss of or damage to any goods, merchandise, freight, or other things or interest whatsoever, other than as aforesaid (not being property on board the insured Vessel and owned by builders or repairers or for which they may be responsible), whether on board the insured Vessel or not, which may arise from any cause whatsoever :

*"Loss of or damage to any harbour, dock (graving or otherwise), slipway, way, gridiron, pontoon, pier, quay, jetty, stage, buoy, telegraph cable or other fixed or moveable thing whatsoever, or to any goods or property in or on the same howsoever caused :*

"Any attempted or actual raising, removal, or destruction of the wreck of the insured Vessel or the cargo thereof, or any neglect or failure to raise, remove, or destroy the same :

"Loss of life, personal injury, illness or payments made for life salvage :

"Any sum or sums for which the Assured may become liable or incur from causes not hereinbefore specified, but which are absolutely or conditionally recoverable from or undertaken by the United Kingdom Mutual Steamship Assurance Association Limited :

"the Underwriters will pay the Assured such proportion of such sum or sums so paid, or which may be required to indemnify the Assured for such loss * * *."

(Emphasis added.)

Zidell argues that the P&I clause covers liability for soils and river sediments because the soils and sediments are "other fixed or moveable things" within the meaning of the

phrase emphasized above. London, on the other hand, argues that if soil and sediments are considered "fixed or moveable things," the policy language is essentially rewritten to cover damage to *everything*, thereby rendering the preceding list superfluous.

In interpreting an insurance policy, our task is to ascertain the intention of the parties. *Holloway v. Republic Indemnity Co. of America*, 341 Or 642, 649, 147 P3d 329 (2006). If an insurance policy explicitly defines the phrase in question, we apply that definition. *See Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or 303, 307-08, 985 P2d 1284 (1999) (so indicating). However, where the policy does not define the phrase in question, "we resort to various aids of interpretation to discern the parties' intended meaning." *Id.* at 307-08. Under that interpretive framework, we first consider whether the phrase in question has a plain meaning, *i.e.*, whether it "is susceptible to only one plausible interpretation." *Id.* at 308. If the phrase in question has a plain meaning, we will apply that meaning and conduct no further analysis; if, however, the phrase in question has more than one plausible interpretation, we will proceed to the second interpretive aid. *Id.* at 312. Namely, we will "examine the phrase in light of 'the particular context in which that [phrase] is used in the policy and the broader context of the policy as a whole.'" *Id.* at 312 (quoting *Hoffman*, 313 Or at 470 (altered text in original)). If a term remains ambiguous— *i.e.*, two or more plausible interpretations "'continue[ ] to be reasonable'" after resort to the interpretive aids outlined above—then "'any reasonable doubt as to the intended meaning of such [a] term[ ] will be resolved against the insurance company * * *.'" *North Pacific Ins. Co. v. Hamilton*, 332 Or 20, 25, 22 P3d 739 (2001) (quoting, among other cases, *Hoffman*, 313 Or at 470 (altered text in original)).

The issue in this case, as set out above, is the meaning of the phrase "other fixed or moveable things whatsoever." That phrase is not defined in the policy itself. Accordingly, we first consider whether the phrase "other fixed or moveable things whatsoever" has a plain meaning. The term "thing" or "things" obviously has a myriad of meanings, a number of which could be applicable here, including: "a product of work or activity"; "an entity that can be apprehended or

known as having existence in space or time as distinguished from what is purely an object of thought"; an "inanimate object as distinguished from a living being"; "an object or entity that cannot or need not be precisely designated"; "equipment or utensils *esp.* for a particular purpose"; a material or substance (as food, drink, medicine) of a specified kind." *Webster's Third New Int'l Dictionary* 2376 (unabridged ed 2002). The terms "fixed" and "moveable" do not elucidate a plain meaning of the phrase "other fixed or moveable things." The word "fixed" means "securely placed or fastened" or "permanently and definitely located : STATIONARY, IMMOVABLE." *Webster's* at 861. "Moveable" means the opposite: "capable of being moved : not fixed : not stationary." *Webster's* at 1479. Thus, based on the text of the policy, "fixed or moveable thing" has many plausible meanings, one of which is that it refers to any moveable or immovable entity having an existence in space and time—essentially, *everything*. Another plausible meaning of the text is that it refers only to certain moveable and immovable things that "cannot or need not be precisely designated" or are "of a substance or material * * * of a specified kind" or for a particular purpose. The words surrounding the phrase—"other" and "whatsoever"—do not provide further clarification. In sum, the text itself suggests the possibility that "other fixed or moveable things whatsoever" designates a class of things that is discernable only by reference to the context in which that phrase appears.

We turn, then, to our second interpretive aid: examining the text of the policy in the context in which it is used and in the context of the policy as a whole. Initially, we reject Zidell's contention that "fixed or moveable things" does, in fact, refer to *everything*. If that were the case, the preceding list of enumerated "things" would be superfluous—a construction that the parties would not have intended. *See Hoffman*, 313 Or at 472 ("We assume that parties to an insurance contract do not create meaningless provisions."). The question, then, is what is the more limited class of "things" that the provision is intended to cover as "other fixed and movable things whatsoever"?

In that regard, London relies on the maxim of *ejusdem generis. See Groshong*, 329 Or at 313 ("[T]his court has

stated that 'the rule of *ejusdem generis* in contracts is peculiarly applicable where specific enumeration precedes the word 'other' followed by general words'."). According to London, the phrase "fixed or moveable things" refers only to fixed or moveable "structures," because the items that precede it in the list are artificial structures. Zidell, in response, argues that "harbour"—the first word in the list—is not so limited; harbours, Zidell contends, are both natural and artificial.

Considering the text "other fixed or moveable things whatsoever" in the context of the rest of the coverage provision and the policy as a whole, we agree with London that soil and river sediment do not bear any relevant similarity to a "harbour, dock (graving or otherwise), slipway, way, gridiron, pontoon, pier, quay, jetty, stage, buoy, telegraph cable * * *" and are therefore not "other fixed or moveable things" within the meaning of the policies. With the exception of harbour, each of the listed items is, in fact, an artificial structure or object (dock, slipway, way, gridiron, pontoon, pier, quay, jetty, stage, buoy, and telegraph cable).[21] And even the term harbour, when considered in light of the rest of the phrase, most likely refers to something that has been built or constructed. *See White v. Jubitz Corp.*, 219 Or App 62, 75, 182 P3d 215, *rev allowed*, 345 Or 175 (2008) ("Under the principle of *noscitur a sociis*, terms in a list are considered to share the same quality or common characteristics."). The term harbor, Zidell correctly points out, can refer to "[a] place either natural or artificial where ships may anchor or lay and be protected from the open sea." Robert H. Brown, *Dictionary of Marine Insurance Terms* 171 (4th ed 1975). An artificial harbor is constructed where no natural harbor exists. *Dictionary of Marine Insurance Terms* at 17. A natural harbor is built in a natural basin. *Dictionary of Marine Insurance Terms* at 263.[22] Thus, in the context of the provision as a whole, we conclude that "other fixed or moveable things whatsoever" does

---

[21] Zidell does not contend otherwise on appeal.

[22] *See also Webster's* at 1031 ("Harbor" is a "small bay or other sheltered part of a considerable body of water usu. well protected either naturally or artificially (as by jetties) against high waves and strong currents and deep enough to furnish anchorage for ships or other craft; *esp.* : *such a place in which port facilities are provided.*" (Emphasis added.)).

not include soil and river sediment—"things" that have no relevant similarities to the other objects and structures listed in the provision.

Accordingly, we conclude that the trial court erred in concluding that soil and river sediment are other fixed or moveable things within the meaning of the P&I coverage.

### b. Owned property exclusion

In its sixth assignment of error, London contends that the trial court erred in concluding that the bumbershoot policies provide coverage for damage to Zidell's own property.[23] That is, London argues that the bumbershoot policies were not intended to provide indemnity coverage to Zidell for damage that Zidell incurs to its *own* property.

The bumbershoot policies at issue provide the following coverage:

"This policy is to indemnify the Assured in respect of the following (including such expenses as are set out in the definition of 'ULTIMATE NET LOSS'):—

"(a)  All Protection and Indemnity risks of whatsoever nature including, but not limited to, those covered by the underlying Protection and Indemnity Insurances or which are absolutely or conditionally undertaken by the United Kingdom Mutual Steam Ship Assurance Association, Limited.

"(b)  General Average, Collision Liabilities, Salvage, Salvage Charges and Sue and Labour arising from any cause whatsoever.

"(c)  All other sums which the Assured shall become legally liable to pay or by contract or agreement become liable to pay in respect of claims made against the Assured for damages of whatsoever nature, on account of:—

"(i)  Personal injuries, including death at any time resulting therefrom,

"(ii)  Property Damage,

---

[23] London's sixth assignment of error pertains only to the bumbershoot policies from 1970 and 1971. From 1972 forward, the bumbershoot policies contained a pollution exclusion provision, and the trial court determined that bumbershoot coverage was precluded after 1972 for that reason.

"caused by or arising out of each occurrence happening anywhere in the world."

Once again, our goal in interpreting the language of an insurance policy is to discern the parties' intent. *Hoffman Construction Co.*, 313 Or at 469. We begin and end, in this instance, with the language of the policies themselves. Subsection (c) of the bumbershoot policies provides coverage for "[a]ll other sums which [Zidell] shall become legally liable to pay or by contract or agreement become liable to pay in respect of claims made against [Zidell] for damages of whatsoever nature, on account of * * * [p]roperty [d]amage." The question under the policies is whether sums that Zidell is legally required to pay (either as the result of an agreement with DEQ or an enforcement action) to remedy soil contamination at the Moody Avenue site constitute "a claim" for "damages."

According to London, a "claim" is a "demand for compensation, benefits, or payment * * *." *Webster's* at 414. "Damages," in turn, are "estimated reparation in money for detriment or injury sustained," or "compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." *Webster's* at 571. In London's words, "Zidell cannot make an enforceable claim for damages against itself."

London, however, does not grapple with the nature of Zidell's environmental cleanup obligations under Oregon law. Under ORS 465.260(4), DEQ may order a person liable for environmental harm "to conduct any removal or remedial action or related actions necessary to protect the public health, safety, welfare and the environment." If that person does not comply with such an order, "the person shall be liable to the department for the state's remedial action costs and for punitive damages not to exceed three times the amount of the state's remedial action costs." ORS 465.260(8). Given that DEQ is authorized to enforce its *own* right to damages as a third-party on account of "property damage," we conclude that the language of the bumbershoot policies unambiguously covers cleanup costs resulting from damage to soil at the Moody Avenue site. Accordingly, we reject London's sixth assignment of error.

### 3. *Attorney fee issues*

#### a. Timely proof of loss

■ London's seventh assignment of error challenges the trial court's conclusion that Zidell's July 26, 1994, letter to London concerning the DEQ action constituted a "proof of loss" for purposes of ORS 742.061, the statute that entitles insureds to attorney fees under certain circumstances.[24] In London's view, the July 26, 1994, letter was not sufficient to allow it to estimate its obligations to Zidell because Zidell had not yet asked for payment of any defense costs and, in fact, did not do so until August 1998, four years later.

In *Dockins v. State Farm Ins. Co.*, 329 Or 20, 33, 985 P2d 796 (1999), the Supreme Court interpreted the meaning of "proof of loss" in ORS 742.061. The court explained:

> "[A]n event or submission is adequate, both for purposes of collecting on the policy itself and for obtaining attorney fees under ORS 742.061, if it accomplishes the *purpose* of a proof of loss. That purpose is to afford the insurer an adequate opportunity for investigation, to prevent fraud and imposition upon it, *and to enable it to form an intelligent estimate of its rights and liabilities before it is obliged to pay*."

*Dockins*, 329 Or at 28 (internal quotation marks and citations omitted; some emphasis added). The court then concluded that "proof of loss" means "[a]ny event or submission *that would permit an insurer to estimate its obligations (taking into account the insurer's obligation to investigate and clarify uncertain claims)*[.]" 329 Or at 29 (emphasis added). *See also Parks v. Farmers Ins. Co.*, 214 Or App 1, 8, 162 P3d 1088 (2007) ("Simply put, 'the proof of loss requirement is intended to trigger the insurer's duty to investigate.' " (quoting *Mosley v. Allstate Ins. Co.*, 165 Or App 304, 312, 996 P2d 513 (2000))).

---

[24] ORS 742.061(1) provides, in part:

"Except as otherwise provided in subsections (2) and (3) of this section, if settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon."

We agree with the trial court that, as of July 26, 1994, Zidell had provided a submission to London that, in light of London's obligation to investigate, would have permitted London to determine its obligations to Zidell under its policies. That letter provided, in part:

"[W]e are again notifying and updating you regarding (a) this potential contamination, (b) the potential for claims of others against [Zidell] arising out of this potential contamination, (c) DEQ's direction with which we are statutorily obligated to comply (at least to the extent of investigating and remediating contamination), and (d) [Zidell's] potential claim under the policy for coverage for remediation, investigation and other expenses, and claims of third parties."

Along with that letter, Zidell enclosed a copy of the demand letter from DEQ to Zidell indicating that Zidell was a potentially responsible party under Oregon's environmental cleanup laws.

The fact that Zidell did not provide London with the specifics of its claims—or, for that matter, the amount of defense costs that it was seeking—does not render the proof of loss inadequate for purposes of ORS 742.061. *See Dockins*, 329 Or at 28 ("[T]his court placed insurers under a duty of inquiry, holding that, even if a submission is insufficient to allow the insurer to estimate its obligations, it will be deemed sufficient if the insurer could accomplish that purpose through a reasonable investigation."). The duty of inquiry, the court held in *Dockins*, extends to those situations in which the insured has not provided an insurer with a complete estimate of liability; that is, the question is whether the insurer could have made the necessary calculation had it made a reasonable inquiry. 329 Or at 28. As in *Dockins*, the record before us does not demonstrate that, had London made a reasonable inquiry, it would have been unable to determine its obligations to Zidell.[25]

---

[25] In that regard, London argues that the evidence establishes that it requested specific amounts from Zidell for defense costs, but that Zidell did not respond to the requests. As we understand the record, the requests for information to which London refers occurred no earlier than 1997—years after Zidell sent its letter in 1994 alerting London to the potential environmental contamination. That evidence hardly demonstrates that London conducted a reasonable investigation three years *earlier* after receiving the July 26, 1994, letter from Zidell.

London also argues that, given earlier correspondence between the parties concerning the Moody Avenue site and the previous course of dealing between London and Zidell on other insurance claims, London would not have understood the July 26, 1994, letter as a proof of loss. Given the language in that letter, however, we conclude that, at the very least, London was obligated to clarify any ambiguity regarding its obligations at that point. *See Dockins*, 329 Or at 28 n 3 (" 'If [the insurer's] contention is that [the insured's] proof of loss was so uncertain that [the insurer] was unable to determine the character of [the insured's] claim, then [the insurer] should have requested [the insured] to make her claim more definite and certain'." (quoting *Heis v. Allstate Insurance Co.*, 248 Or 636, 645, 436 P2d 550 (1968))). Thus, we reject London's seventh assignment of error.

### b. Additional issues concerning attorney fees

In its eighth assignment of error, London argues that the trial court erred in awarding attorney fees to Zidell on declaratory judgment issues that were decided in favor of London. In its ninth assignment of error, London contends that the trial court erred in awarding attorney fees calculated at an unreasonable rate. London's tenth assignment of error concerns the trial court's award of "fees on fees" in the supplemental judgment. Because we reverse and remand for trial on the breach of contract and declaratory judgment claims, we necessarily reverse the award of attorney fees in favor of Zidell. ORS 20.220(3). And because the issues raised by these assignments of error may or may not arise on remand, we decline to address them on appeal.

### B. *Zidell's Cross-Appeal*

#### 1. *Allocation issues*

In its first assignment of error on cross-appeal, Zidell argues that the trial court used the wrong approach to allocate indemnity costs under the various policies. Specifically, Zidell contends that the trial court's methodology is inconsistent with the approach mandated by the 2003 amendments to Oregon's Cleanup Assistance Act, ORS 465.475 to 465.480, and this court's decision in *Cascade Corp. v. American Home Assurance Co.*, 206 Or App 1, 135 P3d 450 (2006), *rev*

*dismissed*, 342 Or 645 (2007), decided after the trial court entered judgment. In response, London argues that the Cleanup Assistance Act is inapplicable and, in any event, violates the separation of powers clauses of the Oregon Constitution; it also argues that *Cascade Corp.* is inapposite.

Under the 2003 amendments to Oregon's Cleanup Assistance Act, when "a general liability insurance policy * * * provides that the insurer has a duty to pay all sums arising out of a risk covered by the policy," the insurer must pay all expenses "proximately arising out of the risk pursuant to the applicable terms of [the] policy * * *." ORS 465.480(3)(a). The parties, for whatever reason, did not discuss the 2003 amendments to the Cleanup Assistance Act in the trial court. Rather than address arguments concerning a statute raised for the first time on appeal, we conclude that it is more prudent to leave the allocation issue—to the extent that it arises on remand—to the trial court in the first instance.[26]

### 2. *Duty to defend under ship dismantling policies*

In its second assignment of error, Zidell argues that the trial court erred in ruling that the ship dismantling policies do not require London to pay defense costs. The argument that Zidell makes on appeal is different from the argument made to the trial court, and given that the case must be remanded for a new trial on both claims, we decline to address that argument for the first time on appeal.

### 3. *Contamination of groundwater*

In its brief on cross-appeal, Zidell contends in its third assignment of error that the trial court erred in granting partial summary judgment to London on the basis of an "owned property" exclusion. Zidell concedes that the issue was controlled by this court's decision in *Schnitzer Investment Corp. v. Certain Underwriters*, 197 Or App 147, 104 P3d 1162 (2005), which was pending in the Supreme Court at the time that Zidell filed its initial briefing. The Supreme Court ultimately affirmed our decision in that case, *Schnitzer Investment Corp. v. Certain Underwriters*, 341 Or

---

[26] London asserts a cross-assignment of error in the event that we were to reverse the trial court's ruling regarding allocation. Because we do not reach the allocation issue, we similarly decline to address London's cross-assignment.

128, 137 P3d 1282 (2006), and Zidell has since withdrawn its third assignment of error.

### 4. *Attorney fee issues*

In its fourth assignment of error, Zidell argues that the trial court erred in declining to award it attorney fees for work concerning the duty to indemnify. In its fifth assignment of error, Zidell argues that the court erred in reducing the award of attorney fees to account for settlements that Zidell had obtained from other parties. For the reasons expressed with regard to London's eighth through tenth assignments of error concerning entitlement to attorney fees, 222 Or App at 495, we decline to reach Zidell's fourth and fifth assignments of error.

Judgment reversed and remanded; supplemental judgment for attorney fees vacated.