Submitted on remand June 18, 2012, on appeal and on cross-appeal, reversed in part and remanded for further proceedings March 6, 2013

ZRZ REALTY COMPANY,
an Oregon corporation,
for itself and as trustee of
the Zidell Remediation Funding Trust,
an Oregon trust;
Zidell Marine Corporation,
a Washington corporation;
Tube Forgings of America, Inc.,
an Oregon corporation;
and Pon Exploration, Inc.,
a Delaware corporation,
fka Zidell Explorations, Inc.,
an Oregon corporation,
*Plaintiffs-Respondents,*
*Cross-Appellants,*

*v.*

BENEFICIAL FIRE AND CASUALTY
INSURANCE COMPANY,
succeeded in interest by
J.C. Penney Life Insurance Company, et. al.,
*Defendants,*

*and*

CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON,
and Certain London Market Insurance Companies,
aka "Lloyd's,"
including the following defendant companies:
Assicurazioni Generali S.P.A.,
Insurance Company of North America (UK) Ltd.,
Commercial Union Assurance Company, PLC,
Edinburgh Assurance Company, Ltd.,
Ocean Marine Insurance Company, Ltd.,
World Auxiliary Insurance Corporation, Ltd.,
Cornhill Insurance Company, Ltd.,
Dominion Insurance Company, Ltd.,
Eagle Star Insurance Company Ltd,
The Threadneedle Insurance Company, Ltd.,

Excess Insurance Company Ltd.,
London & Edinburgh General Insurance Company Ltd.,
New Zealand Insurance Company, Ltd.,
Road Transport & General Insurance Company, Ltd.,
South British Insurance Company, Ltd.,
Ulster Marine Insurance Company, Ltd.,
The United Scottish Insurance Company, Ltd.,
Yorkshire Insurance Company, Ltd.,
Hansa Re & Marine Insurance Company (UK), Ltd.,
La Reunion Francaise (UK) Ltd.,
Economic Insurance Company, Ltd.,
Norwich Union Fire Insurance Society, Ltd.,
Fireman's Insurance Company of Newark, New Jersey,
Swiss Union General Insurance Company, Ltd.,
Leadenhall Insurance Company, Ltd.,
Bishopgate Insurance Company, Ltd.,
Home Insurance Company,
Nippon Fire & Marine Insurance Company (UK), Ltd.,
Switzerland General Insurance Company, Ltd.,
River Thames Insurance Company, Ltd.,
Royal Insurance Company, Ltd.,
British Fire Insurance Company, Ltd.,
British & Foreign Insurance Company, Ltd.,
National Provincial Insurance Company, Ltd.,
The Scottish Lion Insurance Company, Ltd.,
Skandia Marine Insurance Company (UK), Ltd.,
Drake Insurance Company, Ltd.,
Sphere Insurance Company, Ltd.,
Sphere Drake Insurance Company, PLC,
Alliance Assurance Company, Ltd.,
British Law Insurance Company, Ltd.,
and Continental Assurance Company of London, Ltd.,
Liverpool Marine & General Insurance Company, Ltd.,
Phoenix Assurance Company, Ltd.,
Fine Art & General Insurance Company, Ltd.,
Anglo-French Insurance Company, Ltd.,
Baloise Marine Insurance Company, Ltd.,
Baltica Insurance Company (UK), Ltd.,
Fuji Fire & Marine Insurance Company (UK), Ltd.,
R.W. Gibbon Group,
La Preservatrice Group,

Switzerland General Insurance Company (London), Ltd.,
Yasuda Fire & Marine Insurance Company, Ltd.,
Iron Trades Mutual Insurance Company, Ltd.,
Minster Insurance Company, Ltd.,
Reliance Insurance Company,
Sirius (UK) Insurance, PLC,
Indemnity Marine Assurance Company, Ltd.,
London & Hull Maritime Insurance Company, Ltd.,
and associated companies,
C.A. Parr Agencies, Ltd.,
Sun Insurance Office,
Marine Insurance Company, Limited,
and Sumitomo Marine & Fire Insurance Company,
Limited,
*Defendants-Appellants,*
*Cross-Respondents.*

Multnomah County Circuit Court
970806226; A121145

300 P3d 1224

William J. Keys, Judge. (Pre-trial and trial rulings)

Ellen F. Rosenblum, Judge. (Judgment and Supplemental Judgment)

Thomas W. Sondag and Lane Powell PC, and John Folawn and Kirklin Folawn LLP for appellants-cross-respondents.

Dean D. DeChaine, William H. Walters, Bruce L. Campbell, Michelle E. Barton, and Miller Nash LLP, and Robert M. Horkovich, Edward J. Stein, and Anderson Kill & Olick, P.C., for respondents-cross-appellants.

Gregory L. Baird and Gordon & Polscer, LLP, for *amicus curiae* Complex Insurance Claims Litigation Association.

Before Wollheim, Presiding Judge, and Sercombe, Judge, and Nakamoto, Judge.

WOLLHEIM, P. J.

**WOLLHEIM, P. J.**

This case comes to us on remand after the Supreme Court affirmed in part and reversed in part our decision in *ZRZ Realty v. Beneficial Fire and Casualty Ins.*, 222 Or App 453, 194 P3d 167 (2008) (*ZRZ Realty I*), *modified on recons*, 225 Or App 257, 201 P3d 912 (2009) (*ZRZ Realty II*), *aff'd in part and rev'd in part*, 349 Or 117, 241 P3d 710 (2010) (*ZRZ Realty III*), *modified on recons*, 349 Or 657, 249 P3d 111 (2011) (*ZRZ Realty IV*). In our original decision, *ZRZ Realty I*, we addressed, among other issues, whether plaintiffs (collectively Zidell) or defendants (collectively London) had the burden to prove whether environmental damage resulting from the operation of Zidell's business was expected or intended for purposes of various insurance policies issued by London. We held that the trial court had correctly allocated that burden to London as to certain policies, *i.e.*, the "implied fortuity polices" that, by their terms, provided coverage without regard to whether resulting property damage was expected or intended; but, we held that the trial court had erred in allocating that burden to London on "express fortuity policies," *i.e.*, policies that expressly limited coverage to property damage that was not expected or intended. We reversed the judgment (including an attorney fee award) in favor of Zidell and also vacated a supplemental judgment that awarded Zidell additional attorney fees. *ZRZ Realty I*, 222 Or App at 497. On reconsideration, we modified our opinion but adhered to our disposition, again remanding the case for retrial as to all policies. *ZRZ Realty II*, 225 Or App at 262-65. In light of our disposition, we did not reach some of the parties' assignments of error on appeal and cross-appeal, including most of the parties' assignments concerning attorney fees. *ZRZ Realty I*, 222 Or App at 478, 480, 495-97; *ZRZ Realty II*, 225 Or App at 264-65.

The Supreme Court subsequently affirmed our decision as it pertained to the allocation of the burden of proof, but concluded that our remand was too broad. The Supreme Court reasoned that "[t]he remand should have been limited, at least initially, to the question whether, for the purposes of the express fortuity policies, Zidell either expected or intended that a series of contaminants

resulting from the operation of its business would damage the environment." *ZRZ Realty III*, 349 Or at 147. The court also held that we had erred in reversing the attorney fee award in the judgment and in vacating the attorney fee award in the supplemental judgment, because the issue to be retried—whether Zidell expected or intended the damage resulting from its business activity for purposes of express fortuity policies—"would have no effect on either the trial court's ruling that London had a duty to defend Zidell in DEQ's enforcement action or the trial court's conclusion that ORS 742.061 authorized Zidell to recover attorney fees it incurred in this action in establishing and enforcing London's duty to defend." *Id.* at 150.

After reversing our decision in those respects, the court sent the case back to us for consideration of the assignments of error that we previously did not reach. The court described the remand this way:

> "Because we conclude that the Court of Appeals erred in reversing and vacating the fee awards, it follows that we must remand this case initially to the Court of Appeals to permit it to consider those assignments of error. On remand before the Court of Appeals, the parties are also free to ask the court to consider, if appropriate, those assignments of error that the court did not reach because it remanded the case for a new trial on both the express and implied fortuity policies. Because at least some of those issues must go back to the Court of Appeals for its resolution before the case returns to the trial court, we remand this case initially to the Court of Appeals."

*ZRZ Realty III*, 349 Or at 150-51.

The remand, however, did not reach this court immediately, because the Supreme Court issued two more opinions—one on reconsideration that clarified that the trial court was not foreclosed from taking live testimony on remand, *ZRZ Realty IV*, 349 Or 657, and another dealing with Zidell's petition for an award of attorney fees for prevailing on appeal, 351 Or 255, 266 P3d 61 (2011) (*ZRZ Realty V*).

In June 2012, we received the remand judgment from the Supreme Court and invited further briefing from

the parties on what issues remain to be decided by this court. Having reviewed the original briefs, the various appellate decisions in this case, and the parties' most recent submissions, we conclude that the following assignments of error merit further discussion on remand: on appeal, London's second assignment (dismissal of claims as a matter of law), third assignment (inconsistencies in the trial court's findings and conclusions), fourth assignment (expected losses under certain bumbershoot policies), and eighth, ninth, and tenth assignments (each pertaining to attorney fees); and, on cross-appeal, Zidell's first assignment (allocation of indemnity costs), second assignment (defense costs under ship dismantling policies), and fourth and fifth assignments (both concerning attorney fees). And, for the reasons that follow, we now affirm the trial court's rulings concerning the implied fortuity policies; vacate the initial attorney fee award because it includes fees for time spent on issues other than the duty to defend; reject London's argument concerning the supplemental fee award; and decline to reach the allocation question, which will benefit from a better- developed record below.

## I. BACKGROUND

The facts underlying this appeal are set out in the Supreme Court's opinion, which we repeat here to provide context for the various assignments of error.

"Plaintiffs (collectively Zidell) are a group of related companies that began acquiring and dismantling decommissioned navy and merchant marine ships after World War II. Zidell towed the decommissioned ships to a site along the Willamette River in Portland (the Moody Avenue site) where it dismantled the ships for scrap, generally while the ships were tied to a dock at the site. Dismantling the ships resulted in the release of pollutants found in, among other places, the ships' paint, batteries, motors, and fuel tanks. The pollutants included polychlorinated biphenyls, petroleum products in the form of fuel, lubricating, and hydraulic oils, and a variety of metals, such as arsenic, cadmium, chromium, lead, mercury, and zinc. Some of the pollutants were released directly into the river; others contaminated the land on which Zidell operated

its business and, from there, leached into the ground-water and the river.

"Over the years, Zidell purchased different types of insurance from a variety of insurers. Only two insurers, Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies, remain in this litigation; the others have settled. The interests of the two remaining insurers are, for the purposes of this appeal, identical, and we refer to them collectively as London. From 1956 to 1983, Zidell purchased three types of insurance policies from London that are at issue in this litigation: comprehensive general liability policies, a form of marine excess coverage known as bumbershoot policies, and another form of marine insurance known as protection and indemnity policies. In setting out the facts, we discuss the comprehensive general liability policies and refer to the other policies where appropriate.

"The comprehensive general liability policies consisted of primary and excess policies that provided coverage for damage to property but contained an owned property exclusion. *See Schnitzer Investment Corp. v. Certain Underwriters*, 341 Or 128, 138-39, 137 P3d 1282 (2006) (discussing effect of owned property exclusion on coverage for environmental contamination). From 1956 to 1965, London issued a series of comprehensive general liability policies that the parties refer to as the 'implied fortuity policies.'[1] By their terms, those policies provided coverage without regard to whether the property damage that resulted from Zidell's business activities was either expected or intended. One policy, for example, provided coverage for 'any and all liability imposed by law against the Assured for loss of or damage to or destruction of the property of others * * * arising from any cause whatsoever out of the operation' of Zidell's business.

"Despite that broad grant of coverage, the trial court read a limitation into the implied fortuity policies. Specifically, the trial court ruled that 'the general principle that only "fortuitous" losses will be covered will be deemed a condition of each such policy, consistent with the holding

---

[1] "The trial court found that, in addition to the pre-1966 comprehensive general liability policies, London issued protection and indemnity policies from 1957 through 1983 and bumbershoot policies from 1970 through 1977, none of which required that property damage be unexpected and unintended. The court read a fortuity requirement into those policies, as well as into the pre-1966 comprehensive general liability policies." *ZRZ Realty III*, 349 Or at 124 n 2.

in *A-1 Sandblasting & Steamcleaning Co. v. Baiden*, 293 Or 17, 643 P2d 1260 (1982).' As the trial court explained, that principle

"'limits coverage to those losses that were not expected or intended for policies between 1957 and January 1, 1968. From January 1, 1968 until July 1, 1983, the implied fortuity doctrine limits coverage to those losses that were not intended.'

"Both parties accept the limitation that the trial court read into the agreements that they entered into before January 1, 1968.

"Starting in 1966, London began issuing comprehensive general liability policies to Zidell that the parties refer to as the 'express fortuity policies.' Those policies provided coverage only for damages that were both unexpected and unintended. For example, in one of those policies, London agreed to pay Zidell 'all sums which the Assured shall be obligated to pay by reason of the liability [i]mposed upon the Assured by law * * * for damages * * * on account of * * * [p]roperty damage * * * caused by or arising out of [an] occurrence.' The policy defined 'occurrence' as an 'accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in * * * property damage * * * during the policy period.'

"In 1994, the Oregon Department of Environmental Quality (DEQ) issued a notice to Zidell stating that it was potentially responsible for cleaning up the environmental contamination resulting from its business at the Moody Avenue site. Zidell chose to participate in a voluntary clean-up program that DEQ offered and also requested that London, pursuant to the various policies that it had issued over the years, defend Zidell and indemnify it for the costs of remediating any environmental damage that had resulted from Zidell's business. When London denied that it had any obligation to defend or indemnify Zidell, Zidell brought this action, alleging breach of contract and also seeking a declaration of London's obligations under its policies.

"Before trial, the court ruled on summary judgment that London had a duty to defend Zidell in response to DEQ's notice that Zidell was potentially responsible for cleaning

up the environmental damage resulting from its business. The court also ruled, on summary judgment, that London bore the burden of proving that Zidell either expected or intended the environmental damages that resulted from the operation of its business. The court explained that its ruling applied to both the express and the implied fortuity policies.

"With those ground rules in place, the case proceeded to trial on the question of indemnity. Among other things, the parties and the trial court sought to identify the specific contaminants that, as a result of Zidell's business, had damaged the environment over the period of time in which London had insured Zidell. The trial court also sought to determine, regarding each pollutant, whether Zidell had either expected or intended the resulting damage. For example, the trial court found that Zidell had never intended any damage to the environment from removing anti-fouling paint (paint used to discourage the growth of organisms on the ships' hulls) but that 'Zidell management expected damage to sediments from [arsenic found in] anti-fouling paint beginning in 1972.' Because 90 percent of the arsenic found at the site came from removing the anti-fouling paint, the trial court sought to allocate London and Zidell's respective responsibility for the cost of remediating the damage accordingly.

"At the conclusion of the trial, the court issued lengthy findings of fact and conclusions of law, which it incorporated in the judgment. In essence, the court found that, for a number of years, Zidell neither expected nor intended that its business operations would result in environmental damage; however, the court found that, beginning in the 1970s, Zidell expected that some of the substances released as a result of dismantling the ships would damage the soil and also the sediment in the river. As a result of those and other findings, the trial court held that London's policies required it to indemnify Zidell for part of the remediation costs."

*ZRZ Realty III*, 349 Or at 122-26 (footnotes omitted).

The trial court's judgment, entered in April 2003, awarded attorney fees to Zidell in excess of $1.3 million. The court later entered a supplemental judgment that awarded Zidell an additional $268,988.15 in attorney fees.

London appealed the judgment and supplemental judgment, raising ten assignments of error, and Zidell cross-appealed, raising five of its own assignments of error. As previously described, in *ZRZ Realty I* we reversed and remanded the judgment and vacated the supplemental judgment for attorney fees; we then modified that decision on reconsideration in *ZRZ Realty II*. The Supreme Court, in *ZRZ Realty III*, reversed in part our decision and remanded the case to us to consider issues that, because of our broad remand, we had not addressed. We now undertake that task and, in the course of our analysis, will describe in more detail the aspects of previous opinions that relate to issues now before this court.

## II. ANALYSIS

### A. *Coverage-Related Issues*

#### 1. *London's Assignments of Error*[2]

##### a. Second Assignment: Dismissal as a Matter of Law

In its second assignment of error, London asserts that the trial court should have granted its motion to dismiss Zidell's claims pertaining to damage to river sediments, because "the nature of Zidell's knowing and intentional acts were so sure to cause harm that harm must be said to have been expected or intended." In *ZRZ Realty I*, we rejected that argument on two independent grounds. We first explained that the trial court's error in allocating the burden of proof—the subject of London's first assignment of error—had infected the trial in a way that affected our review of the second assignment of error:

> "As discussed above, the trial court's pretrial ruling assigned the burden of proof to London on the question whether the damage was unexpected and unintended and effectively determined that Zidell was not required to prove that the damage was unexpected and unintended as part of its *prima facie* case. That pretrial ruling, which the court adhered to with respect to London's ORCP 54 B(2) motion, doomed that motion for judgment as a matter of law; if the

---

[2] London also raises assignments of error concerning attorney fees, which we discuss separately.

unexpected and unintended issue was not part of plaintiff's *prima facie* case, London would not have been entitled to prevail as a matter of law based on Zidell's evidence alone. Our reversal of the trial court's ruling as to the burden of proof complicates—if not obviates—our review of London's second assignment of error. As the parties discussed below, it is possible that Zidell would have tried the case differently had the burden been assigned to it rather than London. For that reason alone, it would be improper to conclude on appeal that the trial court should have granted a motion regarding Zidell's failure to make the wrong *prima facie* case."

*ZRZ Realty I*, 222 Or App at 478.

Nonetheless, we went on to address and reject on its merits London's argument regarding the sufficiency of the evidence:

"In any event, we disagree with London's argument that the trial court was required, on the record before it, to conclude that the damage for which Zidell sought coverage was, as a matter of law, expected or intended. The gravamen of London's argument under its second assignment of error is that Zidell indisputably knew that *some* harm would result from its activities, such as dumping oil, discharging paint that was by its very design toxic to marine life, and violating state and federal clean water laws. Although we agree that there is evidence in the record from which a trier of fact could have determined that Zidell expected and intended the damage for which it sought coverage, that is not the question before us. Nor is the question before us whether Zidell *should* have expected or intended environmental damage from its activities. Rather, as the Supreme Court has explained in the context of expected and intended harm, the question is whether Zidell had the *subjective intent* to cause injury and harm to the property at the Moody Avenue site. *Allstate Ins. Co. v. Stone*, 319 Or 275, 279, 876 P2d 313 (1994) (explaining that the court has rejected the 'objective "natural and ordinary" consequences approach to applying exclusions for intentionally-inflicted harms'); *see also Nielsen* [*v. St. Paul Companies*, 283 Or 277, 281, 583 P2d 549 (1978)]. ('[T]he acts must have been committed *for the purpose of inflicting the injury and harm* before either a policy provision excluding intentional harm applies or the public policy against insurability attaches.').

"An insured's subjective intent to inflict harm can be established as a matter of law if the insured 'engaged in an act so certain to cause a particular kind of harm that the court will say that the insured intended the harm.' *Fox v. Country Mutual Ins. Co.*, 327 Or 500, 514, 964 P2d 997 (1998) (citing *Snyder v. Nelson/Leatherby Ins.*, 278 Or 409, 413, 564 P2d 681 (1977)). 'In other words, the court should only infer that the insured had a subjective intent to cause harm or injury as a matter of law when such subjective intent is the *only* reasonable inference that may be drawn from the insured's conduct.' *Allstate Ins. Co.*, 319 Or at 279; *see also Nielsen*, 283 Or at 281 ('There are some intentional acts the nature of which is such that it must necessarily be concluded that there was an intention to injure.'). London argues that Zidell's acts fall into that category.

"We are not persuaded that any of Zidell's acts were, by their very nature, sufficient to establish *as a matter of law* that Zidell acted with the purpose of causing harm. The Supreme Court and this court have found intent to injure, as a matter of law, only where such an intent was inherent in the insured's conduct. *See, e.g., Mutual of Enumclaw v. Merrill*, 102 Or App 408, 411-12, 794 P2d 818, *rev den*, 310 Or 475 (1990) (intent to injure inferred as a matter of law where the insured sexually molested his minor granddaughter); *Falkenstein's Meat Co. v. Maryland Casualty Co.*, 91 Or App 276, 280, 754 P2d 621 (1988) (tort of deceit, by its nature, 'is an action from which the intention to do harm must necessarily be inferred'). Otherwise, the matter of intent is a question for the trier of fact, even where the consequences of the insured's actions seem all but certain. *See, e.g., A-1 Sandblasting*, 293 Or at 26 ('The choice to paint the bridge by methods and under conditions expected to cause some compensable harm was intentional, as the insurer asserts, but it was not the kind of purposeful infliction of injury that excludes recovery of indemnity ***.'); *Snyder*, 278 Or at 415-16 (where the insured intentionally rammed the injured party's car, there was 'a permissible but not necessary inference to draw from [the insured's] actions and [therefore] a legitimate question of fact as to whether [the insured] intended the injuries and damage'); *City of Burns v. Northwestern Mutual*, 248 Or 364, 370-72, 434 P2d 465 (1967) (intent not inferred as a matter of law where the city moved the decedent's grave without securing his wife's consent as required by statute). Zidell's acts of disposing

of toxic substances are more analogous to the latter cases than to those in which intent is inferred as a matter of law.

"We are not persuaded that the *only* inference available to the trier of fact was that Zidell purposefully caused damage, or that Zidell engaged in acts so certain to cause harm that intent to injure must be inferred as a matter of law. We therefore reject London's second assignment of error."

*ZRZ Realty I*, 222 Or App at 478-80 (emphasis in original).

London then petitioned for reconsideration of our opinion, including our treatment of the second assignment of error. We allowed the petition for reconsideration and, in a subsequent opinion, explained:

"In its petition for reconsideration, London submits that this court's analysis of whether the harm was expected *or* intended 'arguably conflates those two separate inquiries.' London acknowledges that, as a result of the court's independent basis for rejecting the assignment of error (different allocation of the burden of proof), the court may well adhere to its previous decision; '[r]egardless, London is concerned that statements made by the Court after reaching the foregoing conclusion may lend themselves to further "wrangling" on remand.'

"Given our alternative and independent reason for rejecting London's assignment of error regarding its ORCP 54 B motion, and in the interest of avoiding any confusion on remand, we agree with London that our subsequent discussion of the evidence in the record was unnecessary and should be deleted. Accordingly, we modify our original opinion to delete the discussion of London's second assignment of error that begins with the sentence, 'In any event, we disagree with London's argument that the trial court was required, on the record before it, to conclude that the damage for which Zidell sought coverage was, as a matter of law, expected or intended.' [*ZRZ Realty I*,] 222 Or App at 478."[3]

*ZRZ Realty II*, 225 Or App at 262-63 (emphasis in original).

---

[3] To be clear, our deletion continued to the end of our discussion of the second assignment of error at *ZRZ Realty I*, 222 Or App at 480.

Thus, after reconsideration, our resolution of London's second assignment of error rested on the fact that London erroneously had been assigned the burden of proof with regard to certain policies, and that the error infected Zidell's presentation of its *prima facie* case in a way that made it improper to conclude, as a matter of law, that Zidell had not carried its burden below. We did not distinguish, for purposes of addressing the second assignment of error, between the express fortuity policies (on which Zidell had the burden of proof) and implied fortuity policies (on which London had the burden); rather, we assumed that the trial court's error regarding the burden of proof required a retrial as to all policies.

In *ZRZ Realty III*, the Supreme Court affirmed our allocation of the burden of proof on the express and implied fortuity policies, but concluded that our blanket remand was erroneous. The Supreme Court explained that, in the context of a bench trial, there was no reason why the court's retrial should not be limited, at least initially, to the express fortuity policies. *Id.* at 147. The court then remanded the case to this court and allowed the parties to ask us "to consider, if appropriate, those assignments of error that the court did not reach because it remanded the case for a new trial on both the express and implied fortuity policies." *Id.* at 151.

On remand, London now asks us to address its second assignment of error. London concedes that the second assignment is not among those that this court "did not reach" because of our broad remand; rather, London acknowledges that we rejected its second assignment but asks us to reconsider that holding in light of the more limited remand ordered by the Supreme Court. According to London, it was not unhappy with a retrial on all policies, as we held in *ZRZ Realty I*, and therefore "was properly circumspect in its reconsideration request" of the second assignment of error in *ZRZ Realty II*. But, London argues, "the Supreme Court has now decided that *there will be no retrial* on the implied fortuity policies. Accordingly, [the Court of Appeals] should decide whether, as a matter of law, Zidell expected the damage for which it seeks coverage under those [implied fortuity] policies." (Emphasis by London.)

We agree with London that, in light of *ZRZ Realty III*, our treatment of its second assignment of error merits further consideration. The Supreme Court disagreed with one of the implicit premises of our holding as to the second assignment of error—namely, that the erroneous allocation of the burden of proof on the express fortuity policies necessarily affected the trial of the "unexpected and unintended" damage issue under the implied fortuity policies. Our prior reasoning—*i.e.*, "it would be improper to conclude on appeal that the trial court should have granted a motion regarding Zidell's failure to make the wrong *prima facie* case," 222 Or App at 478—logically extends to those policies on which the court misallocated the burden of proof: the *express* fortuity policies. Accordingly, we elect to reconsider London's arguments that it was entitled to judgment as a matter of law on the *implied* fortuity policies, on which the court correctly allocated the burden of proof.

As for the merits of the second assignment, London argues that the evidence established, as a matter of law, that Zidell expected and intended the damage for which it sought coverage. We analyzed the question of "intent" at length in *ZRZ Realty I*, but later withdrew that part of the opinion (ironically) to "avoid[ ] confusion on remand." *ZRZ Realty II*, 225 Or App at 262-63. Now that there will be no retrial as to the implied fortuity policies, we readopt our previous analysis concerning the evidence of "intent," which is set out above, 255 Or App at 536-38 (quoting *ZRZ Realty I*, 222 Or App at 478-80), and again conclude that the record gives rise to competing inferences as to whether Zidell intended the damage for which it seeks coverage.

Nor are we persuaded that the only inference available to the trier of fact was that Zidell "expected" the damage for which it seeks coverage. The trial court ruled that a person "expects" a result if the person "act[s] with awareness that the result is substantially certain to follow." Suffice it to say that, viewing the record as a whole, a factfinder could draw competing inferences regarding Zidell's degree of awareness of damage to river sediment and groundwater that would result from its activities. The question was one for the trier of fact, and the court did not err in denying London's motion

to dismiss the claims as a matter of law with regard to the implied fortuity policies.

### b. Third Assignment: Inconsistent Findings and Conclusions

In its third assignment of error, London argues that the trial court failed to enter a judgment consistent with its factual findings concerning post-1960 policies. Specifically, London argues that the trial court found as fact that Zidell (1) knew by 1956 that its operations were discharging paint chips into river sediments and (2) knew by 1961 that anti-fouling paint was "toxic to marine life." Yet, the court ultimately concluded that Zidell had coverage up until 1972 for damage to sediments and soil—a legal conclusion that, according to London, is patently inconsistent with the court's other findings.

In *ZRZ Realty I*, we expressly declined to reach the third assignment of error. 222 Or App at 480. On remand, in light of *ZRZ Realty III*, we now reach and reject London's third assignment of error on the merits.

Contrary to London's argument, the court's findings regarding the discharge of paint chips into sediment and the toxicity of anti-fouling paint to marine life are not irreconcilable with the court's ultimate finding that "Zidell management expected damage to sediments and soil from substances contained in anti-fouling paint beginning in 1972." The trial court distinguished toxicity to marine life— for instance, harm to barnacles that attach themselves to the hulls of ship—from damage to the soil and river sediment from substances contained in that paint; it is the latter damage for which Zidell would be liable to DEQ for cleanup costs, and for which Zidell seeks coverage.[4] Once again, the record created an issue for the trier of fact as to

[4] In stating its legal conclusions, the court explained that knowledge about harm to human or marine life was only part of the relevant inquiry for finding expected damage to river sediments:

"The following is the standard for finding expected damage to river sediments: First, that the substance gets on the water. Second, that it sinks. Third, that it is harmful to human or marine life. Fourth, that it is harmful to human and marine life in the medium that it enters the water. *** Zidell knows of and expects damage when Zidell management in charge of the area knew that damage was substantially certain to follow."

what sediment and soil damage Zidell expected or intended, and the trial court's findings simply reflect the fact that it refused to draw certain inferences about Zidell's level of awareness of the damage for which it seeks coverage. The trial court's findings of fact are not inconsistent with its judgment.

### c. Fourth Assignment: Expected Losses Under Bumbershoots

In its fourth assignment of error, London argues that the trial court erred in ruling that bumbershoot policies for 1970 and 1971 covered *expected* losses, so long as those losses were *unintended*.[5] That interpretation of the policies, London submits, was incorrect under federal maritime law and Oregon law, both of which limit coverage to losses that are unintended and unexpected.

In *ZRZ Realty I*, we addressed London's argument on its fourth assignment of error notwithstanding our remand for a new trial, because the interpretation of the policies "present[ed] an issue likely to arise on remand." 222 Or App at 481. On the merits, we held that "the trial court did not err in declining to impose an implicit requirement that losses under the bumbershoot policies be unexpected as well as unintended." *Id.* at 486. However, in response to London's petition for reconsideration, we ultimately withdrew our conclusion regarding the correctness of the trial court's ruling regarding the bumbershoot policies:

> "Rather, we express no opinion on that issue, and, to the extent that the issue arises on remand, nothing in this opinion is intended to preclude London or Zidell from arguing about the legal effect of the trial court's earlier definition of 'expects' or 'intends,' or to preclude London from arguing that, in light of those definitions, the bumbershoots do not cover damages that Zidell knew were 'substantially certain' to occur."

*ZRZ Realty II*, 225 Or App at 265.

---

[5] In England, umbrellas are known as bumbershoots. Hence, the marine insurance policy that provides "umbrella" coverage is known as a bumbershoot policy. *See ZRZ Realty I*, 222 Or App at 481 n 16.

Now, on remand from the Supreme Court, London asks us to address the issue that we reserved in *ZRZ Realty II*: whether the trial court ruled correctly that damage that was "expected but unintended" was covered by the bumbershoot policies. We decline to revisit the fourth assignment of error, however, because our rejection of London's second and third assignments of error regarding the trial court's findings and conclusions, coupled with the Supreme Court's holding that retrial should be limited to the express fortuity policies (which the bumbershoot policies are not), appear to obviate the need to resolve whether the bumbershoot policies cover "expected" damage. The bumbershoot policies at issue cover 1970 and 1971.[6] The trial court ruled that London had not proved that Zidell expected any of the damage for which it sought coverage until 1972—after the coverage period for the bumbershoot policies. *See* 255 Or App at 541-42 (discussing London's third assignment of error). We therefore see no reason to further address whether the bumbershoot policies were impliedly limited to "expected" damages, because Zidell would nevertheless have coverage under those policies in light of the trial court's findings and conclusions, which this court and the Supreme Court have affirmed as they pertain to the implied fortuity policies.[7] Accordingly, we do not revisit the merits of London's fourth assignment of error.

### 2. *Zidell's Assignments of Error*

#### a. First Assignment: Allocation

In its first assignment of error on cross-appeal, Zidell argues that the trial court erred in adopting a "straight-time-on-the-risk" approach to allocating indemnity

---

[6] London's fourth assignment of error refers to the court's ruling as to all marine insurance policies issued after 1968, but London subsequently clarified that its "[f]ourth [a]ssignment of [e]rror challenged the trial court's conclusion that two 'bumbershoot' policies, issued in 1970 and 1971, provide coverage of losses Zidell expected."

[7] In its opening brief, London requested that, with respect to its fourth assignment, we remand to the trial court to amend its findings to reflect that the marine policies only provide coverage for unexpected and unintended losses, and that they are "therefore subject to the rulings disposing of the foregoing assignments." Our rulings on the "foregoing assignments"—London's first through third assignments of error—would not provide London with any further relief.

costs, rather than the "all sums" approach that Zidell had urged. Zidell argues that, shortly after the notice of appeal was filed, the legislature in 2003 adopted the "all sums" rule in amendments to the Cleanup Assistance Act, ORS 465.480(3)(a)—a legislative change that applies to claims arising before or after the effective date of the amendments unless "a final judgment, after exhaustion of all appeals, was entered before [July 1, 2004]." Or Laws 2003, ch 799, §§ 5(1), (2). Moreover, Zidell argues that the trial court's approach is inconsistent with this court's decision in *Cascade Corp. v. American Home Assurance Co.*, 206 Or App 1, 135 P3d 450 (2006), *rev dismissed*, 342 Or 645 (2007).

In *ZRZ Realty I*, we declined to reach the assignment concerning allocation because the trial court on remand would have an opportunity to reconsider the allocation question in light of subsequent changes to the law and was in the best position to pass upon the question in the first instance. We adhere to that conclusion on remand. As the Supreme Court explained in *ZRZ Realty III*, "if the trial court reaches a different conclusion on remand as to when Zidell expected or intended property damage for the purposes of the express fortuity policies, then the court also will presumably have to adjust the findings allocating responsibility for remediating the damage between London and Zidell." 349 Or at 148. And, even assuming that the trial court were to make the same findings on remand as it did initially, we do not understand the Supreme Court's opinion or this court's opinion to preclude the trial court from reconsidering the allocation question in light of amendments to the Cleanup Assistance Act or *Cascade Corp.*—an issue that neither this court nor the Supreme Court addressed on appeal. *ZRZ Realty III*, 349 Or at 148 ("If, on either the existing or a supplemented record, the trial court makes the same findings on remand that the trial court did initially, then it *presumably* can reenter the judgment, with any appropriate adjustment for attorney fees." (Emphasis added.)). Because we conclude that, in light of the statutory changes and developments in case law, any review of this issue would benefit from a better-developed record below, we decline to address Zidell's

first assignment of error.[8] The trial court can address Zidell's argument on remand.

### b. Second Assignment: Ship Dismantling Policies

In its second assignment, Zidell argues that the trial court erred in ruling that certain ship dismantling policies do not require London to pay defense costs. The policy language at issue provides:

> "3. It is further agreed that if by reason of interest in the Vessel [Zidell] shall become liable to pay and shall pay any sum or sums in respect of any liability, claim, demand, damages, and/or expenses arising from or occasioned by * * *:

> "Loss of or damage to any harbour, dock (graving or otherwise), slipway, way, gridiron, pontoon, pier, quay, jetty, stage, buoy, telegraph cable or other fixed or moveable thing whatsoever, or to any goods or property in or on the same howsoever caused:

> "* * * * *

> "[London] will pay [Zidell] such proportion of such sum or sums paid, or which may be required to indemnify [Zidell] for such loss, as their respective subscriptions bear to the insured value of the Vessel hereby insured, provided always that the liability under this clause, together with any liability there may be under Clause 4, in respect of any one accident or series of accidents arising out of the same event, shall be limited to the sum hereby insured, but when the liability of [Zidell] has been contested with the consent in writing of [London], [London] will also pay a like proportion of the costs which [Zidell] shall thereby incur or be compelled to pay.

> "4. This insurance also to pay the expenses, after deduction of the proceeds of the salvage, not recoverable under Clause 3, of the removal of the wreck of the insured Vessel from any place owned, leased or occupied by [Zidell]. [London's] liability under this clause is subject to the limitations in amount provided in Clause 3. The provisions of that clause regarding the payment of legal costs shall also apply hereto."

---

[8] London asserts a cross-assignment of error in the event that we were to reverse the trial court's ruling regarding allocation. Because we do not reach the allocation issue, we likewise decline to address London's cross-assignment.

In the trial court, Zidell argued that, although "[t]he ship dismantling policies do not provide for a duty to defend separate from policy limits, as in traditional [comprehensive general liability] coverage," the policy language nevertheless requires London to pay Zidell's defense costs up to the policy limits. In response, London argued that, under the final sentence of Clause 3, defense costs are recoverable only when liability "has been contested with the consent in writing of [London]"—a condition that Zidell failed to satisfy. In a reply memorandum, Zidell addressed London's objection "to paying defense costs under the ship dismantling policies based on a condition that Zidell's liability must be 'contested with the consent in writing of [London],'" but Zidell did not argue that the "contested with consent" language was inapplicable to defense costs up to policy limits. Rather, Zidell argued that the condition should not preclude recovery because (1) despite entering into a consent decree with DEQ, Zidell was contesting liability; and (2) the failure to obtain London's consent was excused or waived by London's disclaimer of coverage.

The trial court agreed with London's interpretation of the policy language and rejected Zidell's reply. The trial court concluded:

> "The policies have valid and fair conditions that must be met prior to payment of any defense costs. There has to be contested liability, and it has to be with the written consent of the insurer. These are not regular duty to defend policies. This is a choice that can be decided by the insurer. The language is neither vague nor ambiguous. [London] may choose to defend or not to defend. Here the London Underwriters subscribing to the ship dismantling policies did not choose to defend."

On appeal, Zidell argues that the trial court erred in relying on the final sentence of Clause 3, suggesting, for the first time, that the "contest with consent" language is "directed to a specific type of situation":

> "It can happen that a claim is brought against a policyholder and that for economic or other reasons London would prefer to simply pay the claim rather than incur the costs of defending against it. What the clause in question

provides is that, in such a circumstance, if the policyholder still wants to contest its liability, then London will pay the associated costs of defense only if London agrees to do so. In other words, the trial court is correct that London 'may choose to defend or not to defend,' but only (contrary to the trial court) in the special circumstance where London wants to pay the claim and the policyholder wants instead to defend against it."

In *ZRZ Realty I*, we stated that "[t]he argument that Zidell makes on appeal is different from the argument made to the trial court, and given that the case must be remanded for a new trial on both claims, we decline to address that argument for the first time on appeal." 222 Or App at 496. Now, in light of the more limited remand ordered in *ZRZ Realty III*, Zidell asks us to decide its second assignment of error on the merits.

Although Zidell's specific argument has morphed on appeal—a factor that, in light of our broad remand, counseled against offering any opinion on the issue in *ZRZ Realty I*—we are nonetheless persuaded that the parties and the trial court were adequately alerted to the issue of contractual interpretation that Zidell now raises, namely, whether the language in Clause 3 establishes an obligation to pay defense costs up to policy limits. For that reason, we agree with Zidell that, notwithstanding the evolution of its reasoning, preservation principles are not an impediment to our review. *See State v. Haugen*, 349 Or 174, 190, 243 P3d 31 (2010) ("A party ordinarily may preserve an issue for review merely by raising an issue at trial; alternatively (and preferably), a party may preserve an issue by raising the issue, identifying a source for the party's position, and advancing a particular argument." (Citing *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988))). We therefore turn to the merits.

Even in light of Zidell's newly proffered interpretation, we agree with the trial court that the language of Clause 3 "is neither vague nor ambiguous." Under Clause 3, if Zidell "shall become liable to pay and shall pay any sum or sums in respect of any liability, claim, demand, damages, and/or expenses arising from or occasioned by * * * [l]oss of

or damage to any [itemized thing]," then London "will pay *** such proportion of sum or sums so paid, or which may be required to indemnify [Zidell] for such loss[.]" Clause 3 continues by stating that any liability under Clauses 3 and 4

> "in respect of any one accident or series of accidents arising out of the same event, shall be limited to the sum hereby insured, *but when the liability of the Assured has been contested with the consent in writing of the Underwriters, the Underwriters will also pay a like proportion of the costs which the Assured shall thereby incur or be compelled to pay.*"

(Emphasis added.)

Read in isolation, the "will also pay" language could mean, as Zidell contends, that "costs" are a subset of other covered liabilities in Clause 3, and that, when liability is contested with London's consent, London will pay those costs without regard to otherwise applicable policy limits. In context, however, it is evident that "costs" incurred to contest liability are separate from "expenses." Clause 4, which is set out above, distinguishes between "expenses *** not recoverable under Clause 3" and "payment of legal costs" under Clause 3. Clause 1 of the policy is similarly worded, distinguishing between liability as a consequence of collision, which London will pay based on a proportionate formula, and "cases in which the liability of the Vessel has been contested, or proceedings have been taken to limit liability with the consent in writing of the Underwriters"; in the latter case, London "will also pay a like proportion of the costs which the Assured shall thereby incur or be compelled to pay."

Zidell's explanation—that the "will also pay" language applies only in circumstances in which London prefers to pay the claim but the policyholder wants to defend—would impose an implausible limitation on the language of the policy. As London points out, it is difficult to conceive of a reason why London would want to pay the claim *without* incurring defense costs but would nevertheless consent to pay them. Given the parties' respective commercial interests, the only plausible interpretation of the policy is the one that

the trial court applied: London will pay Zidell's defense costs "when the liability of [Zidell] has been contested with the consent in writing of the Underwriters."[9]

Alternatively, Zidell argues that "London should be held to have waived its right to rely on the 'consent provision'" because "an insurer should not be able to rely on such a right while at the same time denying that it owes its policyholder any policy obligation whatsoever." We are not persuaded, however, that London's position on coverage somehow operates as a waiver of its contractual rights concerning defense costs, and we reject the alternative argument without further discussion.

For the reasons stated above, we conclude that the trial court did not err in ruling that Zidell failed to satisfy the unambiguous predicate for coverage of defense costs under the ship dismantling policies. Accordingly, we reject Zidell's second assignment of error on cross-appeal.

B. *Attorney Fee Issues*

All of the parties' remaining assignments of error concern the trial court's rulings regarding attorney fees. Because some of those assignments involve overlapping issues, we have grouped them by subject matter rather than by assignment of error. We review the trial court's rulings regarding Zidell's entitlement to attorney fees for errors of law, and its determinations regarding a reasonable amount of such an award for an abuse of discretion. *E.g.*, *Barber v. Green*, 248 Or App 404, 273 P3d 294 (2012).

---

[9] We note that Zidell has not provided any authorities that would support its interpretation of the policy language. Courts, as far as we can tell, have treated similar "will also pay" language in marine insurance policies as creating an entitlement to defense costs that is distinct from the indemnity obligation. *E.g.*, *Gulf Mississippi Marine Corp. v. Continental Ins. Co.*, 566 F2d 956, 956 (5th Cir 1978) (affirming district court ruling that insurer "was not liable under the indemnity policy held by plaintiff for the costs incurred in defending a claim without the consent of defendants"; policy at issue stated, "in cases where the liability of the Vessel has been contested or proceedings have been taken to limit liability, with the consent in writing, of a majority (in amount) of the Underwriters on the hull and machinery, we will also pay a like proportion of the costs which the Assured shall thereby incur or be compelled to pay"); *St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of Am.*, 1994 US Dist LEXIS 5737, *11 (SDNY 1994) ("[T]he policy clearly states that Royal will 'also pay' defense costs, which indicates that defense costs will be paid in addition to the $110,000 paid for indemnification").

1. *Recovery of Attorney Fees Related to Indemnity Issues*

In its eighth assignment, London argues that Zidell's attorney fee recovery under ORS 742.061 should have been limited to those attorney fees that Zidell incurred in establishing London's duty to defend under the insurance policies. Instead, London argues, the trial court permitted Zidell to recover attorney fees for work that its attorneys performed to "obtain a declaration of coverage for events that may or may not occur"—that is, on the prospective indemnity issue. *See McGraw v. Gwinner*, 282 Or 393, 400, 578 P2d 1250 (1978) (an insured must obtain a money judgment against an insurer to recover attorney fees under statutory predecessor of ORS 742.061; obtaining a declaration of future coverage does not, by itself, trigger the right to attorney fees).

Zidell's response is twofold. At one point Zidell contends, without much elaboration, that "the trial court did not award any attorney fees for work done specifically with regard to London's duty to indemnify." The trial court record suggests otherwise. At a hearing on entitlement to attorney fees, Zidell took the position that "we are entitled to all costs for this court proceeding to date and continuing," but conceded that it might not be able to recover for work performed on certain tort claims it brought against London. The court ruled that Zidell was entitled to attorney fees "for the defense cost portion of the case" from the tender of the DEQ action in July 1994 until the date of the trial court's summary judgment ruling on the duty to defend (July 23, 1999). The court then took up "the question of what about the attorney fees *on the declaratory judgment action up until that same time*." (Emphasis added.)

Citing *McGraw*, London argued that the declaratory judgment claim involved both indemnity and duty-to-defend issues, and that, as to the indemnity issues, Zidell had not obtained a money judgment that would entitle it to attorney fees.[10] After exploring that issue with the parties, the court ruled as follows:

---

[10] Zidell explained that, when the parties went to trial, the breach-of-contract claim was also being tried on indemnity for existing damages, as well as for past defense costs, but conceded that Zidell "didn't win on the indemnity action."

"THE COURT: Here's [the] bottom line and here's the starting point: London will pay attorney fees up until my decision about defense costs.

"[ZIDELL]: For what?

"[LONDON]: About the duty to defend or beyond that?

"THE COURT: Attorney fees with the exception of [certain previously described exclusions regarding tort claims] * * *."

Later, the court adhered to that ruling:

"THE COURT: I don't care if [Zidell] lost it or not. If they have an issue on the summary judgment dealing with the declaratory judgment action, they get it whether they won it or lost it because they are still the prevailing party, if we want to define it that way, at least on defense costs. And at least on the limited guidance of [*Cornell, Howland, Hayes & M., Inc. v. Continental Cas. Co.*, 465 F2d 22 (9th Cir 1972)], I'm going to say they get their declaratory judgment costs up until that point."

As a consequence, Zidell's statement of attorney fees and the court's ultimate award included time spent on the declaratory judgment action prior to July 23, 1999, without regard to whether that time was spent on matters concerning the duty to defend or the duty to indemnify.[11] Thus, we reject Zidell's suggestion that the attorney fee award does not include time spent specifically on indemnification issues.

Zidell's second response—and the bulk of its argument—is that ORS 742.061 "should be interpreted broadly" to include attorney fees regarding the indemnification issues. In fact, Zidell argues that, under ORS 742.061, it is entitled to an award of attorney fees for time spent on those declaratory judgment issues *after* the court's summary judgment ruling—fees that the trial court declined to award and that are the subject of Zidell's fourth assignment of error on cross-appeal. The crux of Zidell's

---

[11] At the court's request, the parties stipulated to an amount of attorney fees based on the court's earlier rulings. The parties agreed that they had stipulated to "the amount to be awarded" and not to the "validity of the claims or objections." The attorney fee award expressly states that "[t]he fact that the parties stipulated to these amounts shall not prejudice any party's right to appeal this Award and Order."

contention, both in response to London's assignment of error and in support of its own assignment on cross-appeal, is that, once an insured obtains recovery that exceeds the insurer's tender, ORS 742.061 entitles the insured to recover all of its attorney fees incurred in litigating the policy, including coverage issues.

The Supreme Court, it turns out, has already considered and rejected the same argument—in the context of Zidell's petition for attorney fees in that court. In *ZRZ Realty V*, the court explained that Zidell was not entitled to appellate attorney fees for work related to the duty to indemnify:

> "Zidell advances a second argument that it raised in the trial court (and the trial court rejected) and that it cross-assigned as error in the Court of Appeals (and the Court of Appeals did not reach). Zidell reasons that, if it recovers more than London tendered on one matter (the duty to defend), then ORS 742.061 permits it to recover the fees that it incurred both on that matter and also on other, separate matters. That is true, Zidell reasons, even though it has no independent right to recover fees under ORS 742.061 for those matters.

> "Zidell cites one case in support of its argument, *Hartford v. Aetna/Mt. Hood Radio*, 270 Or 226, 527 P2d 406 (1974). In that case, the insurer brought a declaratory judgment action to determine its responsibility for a loss (damage to the insured's property), and the insured counterclaimed for monetary damages for failure to pay the full amount of the loss. *Id*. at 228, 235-37. This court held on the declaratory judgment claim that the insurer was responsible for the loss and on the counterclaim that the insurer owed more than it had tendered. *Id*. at 235, 237. This court also awarded the insured fees. *Id*. at 236. As the court later explained in *McGraw*, because the insured in *Hartford* had recovered more on its counterclaim than the insurer had tendered, the insured could recover the attorney fees it incurred both in responding to the insurer's declaratory judgment action and in pursuing the counterclaim. *See McGraw*, 282 Or at 399-400 (explaining *Hartford*).

> "The decision in *Hartford* does not advance Zidell's argument in this case. In *Hartford*, both the insurer's declaratory judgment claim and the insured's counterclaim

involved the same issue—the insured's obligation to pay the insured for damage to its property. Unlike this case, that decision did not involve a situation in which the insured had established a right to recover fees on one matter (the duty to defend) but had not established a right to recover fees on another, separate matter (the duty to indemnify). There may be cases in which the issues are sufficiently related that an entitlement to fees on one issue will warrant awarding fees for work on related issues. This is not one of those cases, however. As we explained in our previous decision, the matter on which Zidell seeks fees (the duty to indemnify) is independent of the matter on which it is entitled to recover fees (the duty to defend). In these circumstances, we agree with the trial court that, at this stage of the litigation, Zidell may recover only those fees that are related to the duty to defend."

*ZRZ Realty V*, 351 Or at 266-67.

In light of the court's reasoning in *ZRZ Realty V*, we conclude that Zidell cannot recover attorney fees for work on the duty to indemnify, because it has not yet shown an independent entitlement to attorney fees on that matter. *Id.* at 267. Thus, the trial court correctly declined to award Zidell attorney fees for post-summary judgment work on the duty to indemnify, but the trial court erred in not imposing that same limitation on recovery for work performed before its summary judgment ruling. That is, Zidell has not established an independent right to recover attorney fees related to the duty to indemnify, which, at this stage of the litigation, precludes recovery under ORS 742.061 for work performed before or after July 23, 1999. We therefore remand with respect to the initial attorney fee award, which was included in the general judgment, for the trial court to reconsider the apportionment and award of attorney fees in light of that error.[12]

2. *Attorney Fee Rates*

In its ninth assignment of error, London argues that Zidell received a windfall because the court awarded

---

[12] London also argues that the court erred in awarding Zidell its "fees for issues common to all insurers, even those who did not owe Zidell a duty to defend." On remand, the court should reconsider that aspect of the attorney fee award in light of the fact that Zidell may recover only those attorney fees related to the duty to defend.

attorney fees in an amount that exceeds what Zidell is obligated to pay under its fee agreement. Specifically, London asserts that Zidell agreed to pay its attorneys based on a fixed hourly rate plus a percentage of any net recovery arising out of claims against third parties. Yet, when Zidell sought attorney fees, it urged the trial court to award fees in an amount equal to the market rates that its attorneys might have billed rather than the rates they had actually billed Zidell. That higher rate was justified, according to Zidell, because the contingent fees had not been calculated or paid to Zidell's attorneys. In London's view, the court's award at that higher rate gave "Zidell a recovery far greater than the amount Zidell agreed to compensate its attorneys. There is no evidence that Zidell will be required to pay its attorneys the difference." *See Associated Oregon Veterans v. DVA*, 308 Or 476, 481, 782 P2d 418 (1989) (holding, under a provision of a contract awarding a "reasonable fee," that the prevailing party was "not entitled to more than it spent on attorney fees").

Suffice it to say that, under the circumstances of this case, we are not persuaded that the trial court awarded an amount that exceeds Zidell's obligation to its attorneys or that the court abused its discretion or somehow committed an error of law in determining a reasonable rate for the work performed by Zidell's attorneys. The lodestar method that the trial court used is a commonly applied and permissible approach for determining the reasonableness of a fee award, even when the insured has retained counsel on a contingency-fee basis. *See, e.g., Strawn v. Farmers Ins. Co.*, 353 Or 210, 217, 297 P3d 439 (2013) (observing, in the context of a contingency-fee recovery by an insured, that "two basic methods of calculation are generally available. One is the so-called 'lodestar' method, by which the attorney is awarded a fee based on a reasonable hourly rate, multiplied by a reasonable number of hours devoted to work on the case, with certain adjustments potentially made to that amount for factors such as the risk of loss and the quality of the attorney's work"); *id.* at 221 n 7 (concluding that ORS 20.075, "although not mandating either a lodestar or percent-of-fund methodology, does not foreclose either"); *see also Strawn v. Farmers Ins. Co.*, 233 Or App 401, 416, 226

P3d 86 (2010) ("[A]n award of 'reasonable' attorney fees does not preclude the use of a multiplier or other fee enhancement * * *. Such an enhancement may be applied at the beginning of the calculation process by increasing counsel's standard or basic hourly rate to a 'reasonable hourly rate' for the work done given the nature of the case * * * or the enhancement may be applied later in the calculation process by increasing a lodestar amount of fees * * *."). We reject London's ninth assignment regarding attorney fee rates without further discussion.

### 3. *London's Credit for Amounts Paid by Settling Defendants*

By the time that attorney fee issues were litigated, the London insurers were the last adverse parties still litigating against Zidell. In response to Zidell's statement of attorney fees, London argued that, because various insurers shared the obligation to defend Zidell and then settled with Zidell during the course of litigation, some of the money recovered from those settling insurers should be allocated to attorney fees, thereby reducing the amount of attorney fees that Zidell could recover from London. The trial court agreed with London, and the parties then stipulated to the amount of a credit, reserving the right to appeal the court's earlier ruling. The trial court's order states:

> "With respect to [London's] objection that [the London defendants] are entitled to a credit to be set off against their statutory liability for [Zidell's] attorney fees due to settlements reached by [Zidell] with other defendants prior to the filing of [Zidell's] Statement, this Court holds that the [London defendants] are entitled to some credit, but has not determined the amount in view of the stipulation [as to the amount to be awarded to Zidell as attorney fees, in light of the court's various rulings]."

Zidell now argues on cross-appeal, as it did below, that London is "fully responsible for Zidell's reasonable attorney fees" and that a set off for fees incurred by settling defendants "conflicts with both the language and the legislative purposes of the attorney fees statute, ORS 742.061." London responds that, unless there is some settlement credit, Zidell's approach would yield a windfall as

opposed to a "reasonable amount" of attorney fees under ORS 742.061. Both sides are correct, to a point.

At the same time that this case was moving through the appellate courts, London was litigating an equitable contribution action against some of the settling insurers. *See Certain Underwriters v. Mass. Bonding and Ins. Co.*, 235 Or App 99, 104-06, 230 P3d 103 (2010), *modified on recons*, 245 Or App 101, 260 P3d 830 (2011) (describing parallel courses of underlying coverage case and contribution case). One of the issues in the contribution action was whether London and the settling insurers owed a common obligation to Zidell under ORS 742.061, thereby making it inequitable for those settling insurers to escape liability for attorney fees. In the course of addressing that issue, we explained that liability for attorney fees under ORS 742.061 is different from the duty to defend: "Unlike the duty to defend, which is a shared obligation that arises independent of completed litigation, liability for attorney fees under ORS 742.061 is a statutory obligation that arises only after the insured prevails at trial." 245 Or App at 107.

That observation concerning ORS 742.061 informs our analysis here as well. Under the statute, Zidell is entitled to attorney fees from London because its recovery exceeded London's highest tender—a separate obligation from whatever duties might have been owed to Zidell by the settling insurers. For that reason, we agree with Zidell that, strictly speaking, London is not entitled to a particular credit for amounts that Zidell might have received as settlements from other insurers.

That said, we agree with London that ORS 742.061 requires that any attorney fee recovery be reasonable. *See Strawn*, 353 Or at 217 (stating that, for purposes of ORS 742.061, "the touchstone for the amount of the award is * * * reasonableness"). In determining the reasonableness of a fee, the trial court shall consider "[s]uch other factors as the court may consider appropriate under the circumstances of the case." ORS 20.075(1)(h), (2). In the particular circumstances of this case, the potential for a windfall—that is, double payment of the same attorney fees—is a factor

that the court can consider in setting a reasonable attorney fee.

As previously noted, the parties stipulated, in light of the court's prior rulings, to an amount of attorney fees. Because we have remanded the attorney fee award for further consideration in light of the erroneous inclusion of fees related to the duty to indemnify (London's eighth assignment of error), the parties will have an opportunity to revisit their stipulated amount, which also included some credit for the settling insurers, and the trial court will have an opportunity to consider the reasonableness of the new attorney fee award in light of any potential windfall to Zidell.

### 4. *Recovery for Time Spent Correcting Billing Statements*

In its tenth assignment of error, London contends that the trial court erred in awarding Zidell attorney fees "for time its attorneys spent correcting their improper billing statements." Zidell's attorneys "block billed" their time; they failed to allocate time between work devoted to particular defendant insurers or to particular tasks. Consequently, London argues, Zidell was required to review painstakingly those billing statements and recreate a division of labor before submitting its attorney fee petition. The problem, according to London, is that it bore the brunt of the block-billing mistake by Zidell's attorneys, because Zidell later sought and was awarded, by way of a supplemental judgment, attorney fees for the time spent preparing the initial petition.

Zidell, for its part, argues that we should not second guess the trial court's determination of what was reasonable regarding the preparation of the attorney fee petition, which took into account a number of factors. We agree with Zidell. The trial court, in its findings and conclusions regarding the supplemental fee request, explained:

"[London's objections] to plaintiff's Initial Statement were aggressively pursued and, in response, aggressively resisted. The contentiousness of the attorney fee issues

and their complexity required [Zidell's] use of a number of attorneys and paralegal staff.

"*  *  *  *  *

"In reaching its decision on the Supplemental Statement, the court considered the factors set forth in ORS 20.075, and, in particular, considered the extensive time and labor required in connection with the Initial Statement, the novelty and difficulty of the questions involved in the attorney fee issue under these circumstances, the skill required of the attorneys preparing and presenting the Initial Statement, the amount involved and results obtained, the length of the attorneys' professional relationship with the client considering when the underlying claims were first initiated, the experience, reputation, and ability of the attorneys involved, and the nature of the fee relationship between [Zidell and its] attorneys."

In applying those factors and reaching the conclusion that it did, the trial court implicitly rejected London's argument that Zidell's block billings inflated the amount of fees reasonably and necessarily incurred in preparing the petition. There is evidence in the record to support that implicit determination, particularly concerning the complexity of this case, and, specifically, the attorney fee process. As Zidell points out, the trial court, in January 2002, conducted two days of hearings on issues related to entitlement to attorney fees, and made various rulings as to what was, and was not, recoverable. Zidell was required to conform its attorney fee request under ORCP 68 to those rulings, which, the trial court found, caused difficulty "sorting out what issues and related work were appropriate for an award of fees." In short, even if block billing complicated the efforts of Zidell's attorneys, we cannot say that the trial court, in light of all the factors it considered, abused its discretion in awarding Zidell $268,988.15 in supplemental attorney fees.

## III.  CONCLUSION

To summarize: We now reject London's second and third assignments of error as they pertain to the implied fortuity policies. We decline to revisit London's fourth assignment of error regarding the bumbershoot policies because, in the current posture, a decision as to whether

those policies cover "expected but unintended" damage would have no effect on the rights of the parties. We also decline to reach Zidell's first assignment of error on cross-appeal, because the questions posed by that assignment would benefit from a better-developed record on remand. We reject on the merits Zidell's second assignment of error on cross-appeal, which concerns defense costs under ship dismantling policies.

As for attorney fees, we conclude, based on London's eighth assignment of error, that the initial attorney fee award in the judgment must be remanded because it includes fees for work performed concerning the duty to indemnify, a matter on which Zidell was not entitled to fees. On remand, the trial court also can consider, in setting a reasonable attorney fee award, the amounts that Zidell received for attorney fees from settling insurers; but, as Zidell correctly argued in its fifth assignment of error on cross-appeal, London is not necessarily entitled to a set off for those amounts. We reject London's ninth assignment of error regarding the billing rates used to calculate a reasonable fee award. And, finally, we reject London's tenth assignment of error—its challenge to the supplemental award of fees.

On appeal and on cross-appeal, reversed in part and remanded for further proceedings.